Filed 12/18/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C078452 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F02646) |
| v. | |
| TINO ALEXANDER PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Raoul M. Thorbourne, Judge.  Reversed in part and affirmed in part.

Timothy E. Warriner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Kathleen Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Daniel B. Bernstein and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

At trial, this case was about the five eyewitness identifications of the shooter at a party for the California State University, Sacramento golf team.  On appeal, the major

1

issues involve defendant Tino Alexander Perez's gang affiliation and whether there is sufficient evidence to support the jury finding that he specifically intended to benefit the Norteño street gang. The reason for the chasm between the trial and the appeal is the unusual fact pattern for a gang case—while the shooter was a validated and heavily tattooed gang member, there is no evidence the party was in gang territory, there were no rival gangs present or involved, there were no gang epithets or gang attire, and there is no evidence the shooting was in retaliation or for revenge. On appeal, defendant challenges the imposition of the gang enhancement on a number of grounds. He also objects to the admission of text messages exchanged between one of the victims and defendant's girlfriend, the prosecutor's closing argument, and the finding the four attempted murders were willful, deliberate, and premeditated. We find there is insufficient evidence to support the gang enhancement and the life terms for willful, deliberate, and premeditated attempted murder are unauthorized. We therefore strike the gang enhancement and the four life terms and remand for resentencing on counts one through four, but in all other respects, we affirm the judgment.

## FACTS

### *Evidence Supporting the Substantive Crimes*

Because defendant does not challenge the eyewitness identifications on appeal, we need not describe each witness's account of what transpired on the night of May 10, 2013. Suffice it to say, the evidence that defendant shot four college students at the party is overwhelming and the jury convicted him of four counts of willful, deliberate, and premeditated attempted murder and assault with a firearm as well as enhancements for the personal use of a firearm and the infliction of great bodily injury. The evidence consists of five eyewitnesses who positively identified defendant as the shooter,[1]

---

[1] An expert in experimental psychology specializing in human perception and memory explained to the jury many of the pitfalls in eyewitness identifications and lineup

incriminatory jail house calls, and a gun and ammunition that match photographs of a gun and ammunition on defendant's cell phone. The evidence that the shooting was related to defendant's gang affiliation, as described *post*, is much, much thinner.

Four close friends, Dwayne Hines, Kevin Booze, Jacarri Brown, and Jahi Vaughn arrived together at the party hosted by the California State University, Sacramento (Sac State) golf team. Their friend, Brandon Garcia, arrived sometime later. Hines attended Sacramento City College and the others were students at Sac State. Vaughn did not testify.

The others testified they saw defendant at the party. He stood out with a dark-colored hat, hair shaved on the sides but with a long ponytail, and lots of tattoos, including an owl figure and the number "90" around his neck, a diamond on his forearm, an image of the State of California on his face, and skeletons on his fingers. Booze attempted to socialize with him and defendant told him, "I'm E."

The party wound down around midnight and many of the partygoers mingled on the court in front of the house. Hines, Booze, and Vaughn began walking to their car when they heard shots and returned to find their friends. Booze and Brown intervened in a heated argument between a Hispanic woman and an African-American man, and the man walked away. But defendant approached and appeared very agitated and angry. The woman reassured him that Booze and Brown had been helping her. She stated, "It's okay, baby. They're cool. Like, they helped me out." But defendant pulled out a gun from his waistband and began shooting.

Vaughn, the first to be shot, was shot in the leg. Defendant shot Hines in the thigh before Hines jumped behind a parked truck for cover. As Booze tried to run away, defendant shot him below the buttocks and in his calf. Brown and Garcia hid behind a

procedures diminishing the reliability of identifications, despite multiple witnesses and their abiding confidence in the accuracy of their memories.

3

car, but defendant pursued them shooting over the top of the car in their direction.  Brown felt a bullet whiz by his shoulder.  As he made a run for the bushes, defendant shot him in the right leg.

Another Sac State student who had attended the party saw defendant shooting and tackled him.  Garcia jumped in as well and disarmed him.  Defendant broke free and ran down the street and into a car with a number of Hispanic females.

At the crime scene, police officers collected a black Holt pistol grip, a bullet, a blood-stained wristwatch, and nine casings.  The bullet that was removed from Brown's leg and the bullet recovered from the scene were both .22-caliber Winchester ammunition.  All nine casings were also .22-caliber Winchester ammunition and they were all fired from the same revolver.

Defendant's cell phone stored many incriminating photographs.  There were photos of defendant flashing gang signs.  There were photos of a box of .22-caliber Winchester ammunition.  And there was a photo of defendant's wallet next to a .22-caliber long rifle revolver.  The revolver had a black grip that appeared to be the same as the black pistol grip recovered from the scene.

Defendant had a propensity for incriminating himself.  His phone calls from jail were recorded.  When asked what happened, in one call defendant responded:  "Yeah, I shot four people, bro.  [¶] . . . [¶]  [T]hat's what they're charging me with . . . .  I didn't kill nobody but them niggers got hit with bullets . . . ."  In another call, he admitted being present at the party.  "You remember that party that we went to when I went with my brother and all them and we end up fighting after the party . . . ."

Defendant's girlfriend, Sara-Tessa Hayes, was a classmate of Jacarri Brown.  In September 2013, they exchanged text messages about the shooting.  Hayes sent the following message:  "Well, the man that you picked out of the lineup is my son's dad.  You sent him to jail two weeks before our baby was born.  You took everything away from us.  My son was born underdeveloped with a lot of medical problems, so my

4

boyfriend can't be there for a sick baby, and I can't even go back to work because it's just me to take care of my son's medical needs.  They want to give Tino -- that means my son grows up without his dad.  So I just thought you should know what you did to me and my family, and had it been the other way around, Tino wouldn't have gone out like no snitch.  What you did was wrong.  Good night."

Brown offered to contribute financially for the care of the baby.  In a later text message, Hayes wrote:  "Instead of showing concern, he changed the subject and asked me to lie and tell you that you must have recognized him from when he would come to Sac State to see me and to make sure you don't testify because they are getting ready for trial."  She apologized for everything she had said previously and stated:  "[Y]ou didn't ruin my family.  He ruined us himself.  I was just too shortsighted and lonely to realize it.  I'm just not making excuses for him anymore."  She concluded, "He did what he did and it was wrong, just like you said."

### *Evidence Supporting the Gang Enhancement*

The attorneys entered into the following stipulation:  "Norteños are a criminal street gang.  It is an ongoing organization, association, or group of three or more persons, whether formal or informal that has a common name or common identifying sign or symbol.  The chief primary activities of the Norteños are murder, attempted murder, robbery, assault, assault with a firearm, and kidnapping.  The members of the Norteños, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.  The pattern of criminal activity has occurred after September 26, 1988.  The defense stipulates that this agreement satisfies the elements located in the jury instructions concerning what is needed to prove that the Norteños are a criminal street gang.  The defense disputes whether the defendant is a member of the Norteños."

Detective John Sample opined that defendant was a Varrio Garden Land Norteño (VGLN) based on (1) his interviews of defendant's brother; (2) his review of eight police reports involving defendant, four of those reports documenting defendant in the company

5

of Norteños; (3) his search of defendant's cell phone and monitoring of his Facebook account; and (4) his examination of photographs of defendant's tattoos. Detective Sample testified that VGLN is affiliated with the Norteño Broderick Boys of West Sacramento, where defendant's family lives. He explained that a person must satisfy only two of 10 criteria to be validated as a gang member. Defendant was validated in 2010 as a Norteño gang member. He was housed with "northerners" at the county jail.

Detective Sample described three tattoos connoting a gang affiliation, two on defendant's chest and back that were not visible at the party and one on his hands that had been covered up. "Nutty North" appeared on his chest and the word "Nutty" appeared on a portion of his back. The latter tattoo looked like it was incomplete. One dot and four dots signified the number 14 and the 14th letter of the alphabet is "N." According to Detective Sample, the four dots had been covered and could be perceived by gang members as disavowing the gang. Covering tattoos and forsaking gang colors are two ways a gang member can drop out and distance himself from a gang. Defendant was not wearing red at the party. Detective Sample acknowledged that gang membership was an "ever-changing situation."

Detective Sample gave the jury a basic primer on the sociology and psychology of gangs. Central to gang membership and cohesiveness, according to the detective, is instilling fear in the community and among rival gang members as a vehicle to achieve respect. He opined, therefore, that defendant intended to benefit the gang with his shooting rampage because it would instill fear in the minds of the students and thereby enhance the gang's reputation.

Two other officers testified to personal contacts they had with defendant. In 2008 one officer detained defendant with two validated members of the Broderick Boys. Although defendant denied being in a gang, the officer observed tattoos on both of his hands. In 2012 another officer observed defendant with three individuals, two who were validated members of the Norteño gang, in a car that contained a firearm in the trunk and

6

a bag of ammunition tucked in between the seats where defendant had been seated. Defendant again denied gang membership, but the officer testified defendant remained a validated Norteño gang member based on his tattoos, his association with Norteños, and his wearing of gang colors.

The defense subpoenaed two female students who had attended the May 10 golf team party to testify to the appearances of other Mexicans at the party. Neither witnessed the shooting; one had left before it began and the other was in the house when it occurred. Both were interviewed by the defense over a year after the shooting and neither had a clear recollection of the other partygoers. Neither talked to any of the Mexicans they vaguely recalled. Unlike the small get-togethers they usually had, the party grew to about 150 people.

Jordan Bidlack admitted to stereotyping. She described four or five Mexican males she saw at the party, and although she could only recall one tattoo on one of them, she assumed they all had tattoos. She specifically remembered the one tattoo on the neck region. She thought they were "sketchy" so she did not talk to them and she tried to stay away from them. To her, they did not fit the "Sac State mold." They dressed similarly and were "roughly shorter than a lot of the student athletes" attending the party. More than one had a rattail. She did not recognize any of the six photographs in the photo lineup the defense investigator showed her and she could not remember any of their facial features.

Ellese Dias, a former member of the golf team, was also at the party with her boyfriend before the shooting began. She too testified that the party grew larger throughout the evening and many people stuck out "as not fitting the typical mold of Sac State students." She described seven to 10 Mexicans, dressed similarly, but admitted she did not interact with them. They were primarily in white T-shirts and jeans or shorts. She estimated that seven to eight of the Mexicans had excessive tattoos. Like Bidlack,

she was unable to identify anyone in the photographic lineup the defense showed her. She did remember that three of the Mexicans had long hair.

A jury found defendant guilty of four counts of attempted murder (Pen. Code, §§ 664/187, subd. (a))[2] and four counts of assault with a firearm (§ 245, subd. (a)(2)). The jury found that each of the attempted murders was willful, deliberate, and premeditated. As to the attempted murder counts, the jury found he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). As to the assault with a firearm counts, the jury found he personally inflicted great bodily injury (§ 12022.7, subd. (a)). And as to all the counts the jury found defendant acted to benefit a criminal street gang (§ 186.22, subd. (b)(1)) and he personally used a firearm (§§ 12022.5, subds. (a) & (d), 12022.53, subd. (b)).

## DISCUSSION

## I

### *Gang Enhancement*

Defendant contends the evidence was insufficient to sustain the jury's finding that he committed the substantive offenses for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1), which provides: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ." "Like a conviction unsupported by substantial evidence, a true finding on a gang enhancement without sufficient support in

---

[2] Further undesignated statutory references are to the Penal Code.

the evidence violates a defendant's federal and state constitutional rights and must be reversed." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 947 (*Franklin*).)

The evidence must establish both of the two prongs to the gang enhancement under section 186.22, subdivision (b)(1). "First, the prosecution is required to prove that the underlying felonies were 'committed for the benefit of, at the direction of, or in association with any criminal street gang.' (§ 186.22[, subdivision ](b)(1).) Second, there must be evidence that the crimes were committed 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Rios* (2013) 222 Cal.App.4th 542, 561 (*Rios*).)

In deciding whether substantial evidence supports both prongs, we apply the familiar standard of review for challenges to the sufficiency of the evidence. (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1359.) We review the entire record in search of reasonable and credible evidence of solid value, viewing all the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in favor of the jury's findings. (*People v. Ramon* (2009) 175 Cal.App.4th 843, 850 (*Ramon*); *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.) We cannot, however, go beyond reasonable inferences into the realm of speculation, conjecture, surmise, or guesswork. (*Ramon*, at p. 851.) "A trier of fact may rely on inferences to support a conviction only if those inferences are 'of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt' that the inferred facts are true." (*Rios, supra*, 222 Cal.App.4th at p. 564.)

Not every crime committed by a gang member is gang related. (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*); *Rios, supra*, 222 Cal.App.4th at p. 565.) Nor can a crime be found to be gang related simply because the perpetrator is a gang member with a criminal history. (*In re Frank S., supra*, 141 Cal.App.4th at p. 1199.) Although a lone actor is subject to a gang enhancement, merely belonging to a gang at the time of the commission of the charged conduct does not constitute substantial evidence to support an

inference the sole actor specifically intended to promote, further, or assist any criminal conduct by gang members. (*Rios*, at p. 566) Otherwise, as the court observed in *Rios*, "gang enhancement would be used merely to punish gang membership." (*Id.* at p. 574.) Rarely is the perpetrator's intent proven by direct evidence; usually it must be inferred from the facts and circumstances surrounding the case. (*Id*. at pp. 567-568.)

A cottage industry of gang experts has grown to meet a perceived need to assist juries in understanding all things gang related. While a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045-1046.) A hypothetical question must pose facts shown by the evidence because "[a] hypothetical question not based on the evidence is irrelevant and of no help to the jury." (*Id.* at p. 1046.)

Indeed, there are caveats to the sufficiency of gang expert testimony to support the imposition of a gang enhancement. General opinion testimony when offered by a gang expert " 'opens the door for prosecutors to enhance many felonies as gang-related' (*In re Frank S., supra*, 141 Cal.App.4th at p. 1199), by expanding the gang enhancement statute to cover virtually *any* crime committed by someone while in the company of gang affiliates, no matter how minor the crime, and no matter how tenuous its connection with gang members or core gang activities." (*In re Daniel C., supra*, 195 Cal.App.4th at p. 1364.) Moreover, "purely conclusory and factually unsupported opinions" that the charged crimes are for the benefit of the gang because any violent crime enhances the gang's reputation is insufficient to support a gang enhancement. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820 (*Ramirez*).)

That is not to belittle or understate the central role of gang experts in establishing both prongs of the section 186.22 enhancement. It is certainly true " '[e]xpert opinion

10

that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang, supra*, at p. 1048.) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22[, subdivision ](b)(1)." (*Albillar, supra*, 51 Cal.4th at p. 63.) The facts in *Albillar*, however, stand in stark contrast to the facts before us and, on those facts, the Supreme Court's deference to the gang expert's testimony is unremarkable.

In *Albillar*, three 20-something gang members, heavily tattooed with gang signs, assisted each other in raping a 15-year-old girl in their apartment, which was cluttered with gang paraphernalia including gang clothing, photographs of the defendants and fellow gang members wearing gang clothing and flashing gang signs, papers with gang graffiti, and a phone list of fellow gang members. (*Albillar, supra*, 51 Cal.4th at pp. 51-52, 62.) The Supreme Court summarized the gang expert's testimony this way: "Because each defendant was a member of the Southside Chiques, he could and did rely on the others' cooperation in committing the offenses against Amanda M.: Albert suppressed his own personal interest in having sex with the victim and immediately yielded to the others when they asked if they could 'get in'; without another word being spoken, Albert and Madrigal held the victim's legs down while Alex raped her; Albert and Alex blocked the door while Madrigal raped her; and Alex and Madrigal remained in the apartment while Albert raped her. Defendants knew, because of the nature of the gang, that no one would be a 'rat,' which would be 'one of the worst things, if not the worst thing the gang can have within itself.' " (*Id.* at p. 61.)

The gang expert testified that, not only did gang members work in association, but also that the rapes were perpetrated to benefit the Southside Chiques gang. (*Albillar, supra*, 51 Cal.4th at p. 63.) He responded to a hypothetical based on the facts of the

11

charged crimes where the victim knew that at least two of the perpetrators were gang members. The expert stated that "More than likely this crime is reported as not three individual named Defendants conducting a rape, but members of [Southside] Chiques conducting a rape, and that goes out in the community by way of mainstream media or by way of word of mouth. That is elevating [Southside] Chiques' reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity." (*Id*. at p. 63.)

Here, by contrast, the only shred of evidence possibly connecting the shooting to VGLN is the fact defendant was a tattooed, validated gang member and there were four to 10 other Mexicans at the party, some of whom had tattoos. Most striking is the absence of gang evidence. Unlike the defendants in *Albillar*, there is no evidence that any of the visible tattoos on defendant or any of the tattoos on the other Mexican partygoers were gang related and there is no evidence that any of the other Mexicans were present during the shooting, let alone assisting defendant in any way. There is no evidence the other Mexicans at the party were members of any gang whatsoever. There is no evidence that any participant shouted out a gang name or threw up a gang sign. There is no evidence defendant or any of the other Mexicans were wearing gang colors. There is no evidence any of the students at the party knew defendant was a member of a gang. There is no evidence that any rival gang members were present at the party or that the shooting was done in retaliation or retribution for prior gang activity. There is no evidence the shooting occurred in gang territory. None of the students who testified at trial attributed the shooting to a gang. Thus, there was no eyewitness testimony that even hinted the shooting was gang related.

The only evidence offered in support of the gang enhancement was the testimony of Detective Sample, the prosecution's gang expert. He too was asked a hypothetical based on the prosecution's evidence. The prosecutor inquired: "And if a Norteño gang member crashes a party, after the party shoots a gun several times in the air, and then

12

proceeds to shoot several college students for trying to assist a friend of that gang member, would you think that that shooting of the college students was for the benefit of and in association with or at the direction of the Norteños?"

Detective Sample answered affirmatively and explained his rationale. "Again, we talked about the reputation for Norteños. You have a violent act, like this shooting, especially in a public setting, that's going to instill fear in anybody who knows about that shooting occurring. That fear is going to be now attributed to the reputation of the Norteños.

"And an individual who committed that crime being a specific Norteño, he also will receive that same benefit as an enhanced reputation. He's going to be more feared. He's also going to enhance his reputation in the gang as somebody not to be trifled with and is to be feared.

"So overall the crime would be that violent reputation would transpose itself straight on to the Norteño gang."

In this gang expert's view, therefore, essentially any shooting by a gang member is gang related because the use of violence enhances the gang member's reputation, and thereby inures to the gang's benefit by instilling fear in the community. Many courts have soundly rejected such a sweeping generalization untethered, as it is, to specific evidence of both prongs of the gang enhancement. (See, e.g. *Ramirez, supra*, 244 Cal.App.4th at p.819; *In re Daniel C., supra*, 195 Cal.App.4th at p. 1363; *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662 (*Ochoa*); *Ramon, supra*, 175 Cal.App.4th at p. 853.) And the glaring absence of evidence connecting the shooting to a gang, other than the mere fact the perpetrator was a gang member, leaves the evidence woefully short of the sufficiency needed to sustain the enhancement. In short, the prosecution's evidence, including the gang expert's speculation about the hypothetical benefit to the Norteños and the hypothetical shooter's specific intent to promote, further, or assist the gang is far more analogous to cases in which the evidence was found insufficient to

13

support the enhancement than to the abundance of gang-related evidence in *Albillar, supra*, 51 Cal.4th 47.[3]

In *In re Frank S.*, a minor was charged with the possession of a dirk or dagger and a small bindle of methamphetamine, as well as false representation to a police officer. (*In re Frank S., supra*, 141 Cal.App.4th at p. 1195.) He was also carrying a red bandana. (*Ibid*.) He was alone at the time he was stopped on his bicycle with the knife and told the police officer he had been jumped two days earlier and needed the knife for protection against "the Southerners." (*Ibid*.) During intake, he described himself as an affiliate of the Norteños. (*Ibid*.) The gang expert opined that the knife benefits the Norteños because " 'it helps provide them protection should they be assaulted by rival gang members.' " (*Id*. at p. 1199.) The court found the evidence insufficient to support the gang enhancement, emphasizing the lack of gang-related evidence. "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Ibid*.) The court rejected the notion that the gang expert's opinion that the minor harbored the specific intent to use the knife for a gang-related purpose and that the knife, under these circumstances, benefited the Norteños, constituted substantial evidence to support the enhancement. (*Ibid*.)

In *Ochoa*, the gang expert testified the carjacking and weapon possession benefited the gang "by providing general transportation to the gang's members, by enabling transportation of narcotics for sale by the gang, by enabling transportation to

_____

[3] We characterize the evidence as abundant in *Albillar* in comparison to the prosecution's meager gang-related evidence in the case before us, but we note that the dissenting justices found even that evidence insufficient to sustain the gang enhancement because the three gang members were family members, the rapes occurred in the family apartment, which was not in gang territory, and rapes were not condoned, let alone celebrated, within the Hispanic gang culture. (*Albillar, supra*, 51 Cal.4th at pp. 69, 71 (conc. & dis. opn. of Werdegar, J.).)

commit further crimes by the gang, by providing economic benefit to the gang by sale of the vehicle, by elevating defendant's status within the gang, and by raising the gang's reputation in the community." (*Ochoa, supra*, 179 Cal.App.4th at p. 656.) He acknowledged, however, there was no evidence the defendant transported any gang members or claimed responsibility for the carjacking in the name of the gang. (*Ibid.*) The defendant, a self-identified member of the Moreno Trece, was alone when he approached the victim sitting in his mother's car, pointed a gun at his face, and demanded that he give him the car. (*Id*. at p. 653.) The expert's testimony, "as to how defendant's crimes would benefit Moreno Valley 13, was based solely on speculation, not evidence." (*Id*. at p. 663.)

The court found the evidence insufficient to sustain the gang enhancement. The opinion provides a penetrating summary of what was lacking. "Defendant did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses. There was no evidence of bragging or graffiti to take credit for the crimes. There was no testimony that the victim saw any of defendant's tattoos. There was no evidence the crimes were committed in Moreno Valley 13 gang territory or the territory of any of its rivals. There was no evidence that the victim of the crimes was a gang member or a Moreno Valley 13 rival. Defendant did not tell anyone, as the defendant did in [*People v.* ]*Ferraez* [(2003) 112 Cal.App.4th 925], that he had special gang permission to commit the carjacking. [Citation.] Defendant was not accompanied by a fellow gang member." (*Ochoa, supra*, 179 Cal.App.4th at p. 662, fn. omitted.)

*In re Daniel C.* distinguishes the sufficiency of the evidence to support the first prong from the second prong of the gang enhancement. There was substantial evidence to support the first prong, that is, that the robbery was committed "in association with" (§ 186.22, subd. (b)(1)) a criminal street gang because the defendant, a gang member, was accompanied by an admitted Norteño and another young affiliate of the gang. (*In re*

15

*Daniel C., supra*, 195 Cal.App.4th at pp. 1358-1359.) They all wore red. (*Id*. at p. 1359.) But the court found the evidence was insufficient that the defendant committed his crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id*. at p. 1361.) Again the deficiency was in the gang expert's testimony.

"Here, [the gang expert] based his opinion that appellant committed the robbery to further the interests of the Norteño gang on the premise that it was a violent crime, and gangs commit violent crimes in order to gain respect and to intimidate others in their community. But, nothing in the record indicates that appellant or his companions did anything while in the supermarket to identify themselves with any gang, other than wearing clothing with red on it. No gang signs or words were used, and there was no evidence that [the assistant manager of the supermarket] or any of the other persons who witnessed the crime knew that gang members or affiliates were involved. Therefore, the crime could not have enhanced respect for the gang members or intimidated others in their community, as suggested by [the gang expert.]" (*In re Daniel C., supra*, 195 Cal.App.4th at p. 1363.)

The gang expert testimony also came up short in *Rios.* "The only facts that the prosecution asked the expert to consider in the hypothetical were (1) the person was a gang member and (2) he possessed a gun. In our view this was insufficient to impose the gang enhancement (§ 186.22[, subd. ](b)(1)) on the carrying a loaded firearm in a vehicle count (former § 12031, subd. (a)(1); count 1). Although *Albillar* instructs that the prosecution may rely on the charged offense as the criminal conduct supporting the enhancement when the defendant acts in concert with others, in a case such as this, where the defendant acts alone, the combination of the charged offense and gang membership alone is insufficient to support an inference on the specific intent prong of the gang enhancement. Otherwise, the gang enhancement would be used merely to punish gang membership. "As the court stated in *Rodriguez*, '[m]ere active and knowing participation in a criminal street gang is not a crime.' ([*People v. ]Rodriguez*[ (2012)] 55 Cal.4th

16

[1125,] 1130.)  We therefore hold that the expert testimony in response to the hypothetical in this case was insufficient to support an inference that defendant carried the gun in the vehicle with the specific intent required for the gang enhancement." (*Rios, supra*, 222 Cal.App.4th at pp. 573-574.)

The evidence missing was the same as in *In re Frank S.*, *Ochoa*, and the case before us.  "[T]here was no evidence that defendant was in Norteño territory or rival gang territory when he stole the car; that he called out a gang name, displayed gang signs or otherwise stated his gang affiliation; or that the victims of the car theft were rival gang members or saw his tattoos or gang clothing." (*Rios, supra*, 222 Cal.App.4th at p. 574.)

A pattern emerges in the challenges to gang expert testimony.  Echoing the testimony offered in *In re Frank S.*, *Ochoa*, and *Rios*, the gang expert in *Franklin* also opined that the defendant made criminal threats, assaulted, and falsely imprisoned his victim for the benefit of a criminal street gang, particularly by instilling fear in the victims and their larger community.  (*Franklin, supra*, 248 Cal.App.4th at pp. 943, 950.)  But there was no evidence that any of the defendant's fellow gang members were aware of the crimes or participated in them.  There was no evidence showing the defendant committed the crimes in association with other gang members.  Given the lack of evidentiary support for the gang expert's testimony, the court struck the gang allegations.  (*Id.* at p. 952.)

The Attorney General argues that Detective Sample's testimony provides ample evidence defendant specifically intended to promote, further, or assist the commission of crimes by other gang members.  The Attorney General cites to Detective Sample's testimony that defendant stood out because he had tattoos on his face, neck, arms, and fingers, the other Mexicans also had tattoos and dressed similarly to defendant, and he fired gunshots to intimidate the college students and to further the gang's reputation.  Cumulatively, this testimony is as unsubstantiated and insubstantial as the gang expert testimony found lacking in *In re Frank S.*, *Ochoa*, *Rios*, and *Franklin*.

17

Essentially, Detective Sample testified to no more than the fact a Mexican tattooed gang member was involved in a shooting and possibly three of the other Mexicans at the party, who appeared to be his companions, all had tattoos. Although the Attorney General characterizes the tattoos as "gang tattoos" there was no evidence whatsoever that any of his Mexican companions' tattoos were gang related. Nor were any of defendant's visible tattoos. Rather the Attorney General ascribes a gang connotation to any tattoo, an inference based solely on impermissible speculation. Given that defendant had tattooed over the gang-related symbols on his fingers and the Nutty North tattoo was not visible to the partygoers, we conclude the mere presence of tattoos was insufficient to sustain a gang enhancement.

And, as in all of the cited cases, there simply was no other evidence to support the enhancement. Missing was all evidence typical of crimes committed for the benefit of the gang and intended to promote, further, or assist the commission of crimes by gang members—gang colors, gang clothing, gang accruements, gang signs, gang epithets, help by other gang members. Here there is no evidence any of the college students knew of defendant's gang affiliation. The evidence consists only of a gang member committing a violent crime alone. The courts in the above-cited cases have found such a dearth of evidence insufficient for all the reasons we have discussed at length and we follow their lead in striking the gang enhancement for lack of substantial evidence to support it.[4]

## II

### *Premeditated Attempted Murder Life Terms*

Pursuant to section 664, attempted murder is punishable with a term of five, seven, or nine years, unless the fact that the attempted murder was willful, deliberate, and premeditated is alleged in the accusatory pleading and found true by the trier of fact, in

---

[4] Because we must strike the gang enhancement for insufficiency of the evidence, we need not address the multiple other challenges to the gang enhancement defendant raises.

18

which case the defendant is subject to life imprisonment. Defendant contends his life sentence was unauthorized and violated his constitutional right to due process because the prosecutor failed to allege the attempted murder counts were committed willfully, deliberately, and with premeditation as required by section 664. He is correct and the Attorney General does not contend otherwise. But the Attorney General insists defendant forfeited his objection by failing to challenge the issue in the trial court. The question is whether the mere mention of the possibility of an enhanced sentence for premeditated attempted murder during the court's discussion of unrelated jury instructions imparts the notice required by due process as described in *People v. Houston* (2012) 54 Cal.4th 1186 (*Houston*) or whether we should adopt the rationale of *People v. Arias* (2010) 182 Cal.App.4th 1009 (*Arias*) in holding the sentence was unauthorized in light of the prosecution's failure to satisfy the express statutory requirement coupled with the failure to advise defendant of the potential enhanced penalty.

We begin with *Arias*. Arias, a gang member, shot three African-American males in gang territory, one of whom died. (*Arias, supra*, 182 Cal.App.4th at pp. 1012-1014.) His defense, like defendant's, was misidentification. (*Id*. at p. 1015.) Arias was charged with one count of first degree murder and two counts of attempted first degree murder, but the information did not allege that the attempted murders were willful, deliberate, and premeditated. (*Id*. at p. 1017.) The prosecution never sought to amend the information. (*Ibid*.) As here, the judge did instruct "that if the jury found defendant guilty of attempted murder, it must make a separate determination of whether the prosecution proved the attempted murder was done willfully and with premeditation and deliberation." (*Ibid*.) The jury did not make any express findings as to premeditation and deliberation, but did find defendant guilty of two counts of " 'first degree attempted murder.' " (*Ibid*.) The trial court sentenced Arias to life in prison pursuant to section 664 for the attempted murder convictions. (*Arias*, at p. 1017.)

19

Like defendant, Arias argued the life term was unauthorized. The Court of Appeal agreed. The prosecution, the court explained, "failed to comply with the unambiguous pleading requirement set forth in section 664, subdivision (a)." (*Arias, supra*, 182 Cal.App.4th at p. 1017.) Following the reasoning of the Supreme Court in *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*), the court struck the life sentences based on the plain meaning of the statute and due process considerations. "[I]n addition to the statutory requirements that enhancement provisions be pleaded and proven, a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*Id*. at p. 747.)

*Mancebo* was a one strike case that did not involve section 664. But, like section 664, the pertinent one strike statute provided enhanced penalties only if any of the qualifying circumstances "is alleged in the accusatory pleading pursuant to this section, and is either admitted by the defendant in open court or found to be true by the trier of fact." (§ 667.61, subd. (o); *Mancebo, supra*, 27 Cal.4th at p. 742.) The information generally alleged the existence of multiple victims, albeit not specifically within the one strike law allegations. (*Mancebo*, at p. 745.) At sentencing, in order to impose a one strike law sentence and a firearm enhancement without improper double use of one finding, the trial court utilized the multiple victim circumstance under section 667.61, subdivision (e)(5). (*Mancebo*, at pp. 739-740.)

The court found the sentence was unauthorized. Nothing in the charging documents or pleadings "informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing under section 667.61, subdivision (a). Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms under section 667.61, subdivision (a) *and* use the circumstance of gun

20

use to secure additional enhancements under section 12022.5(a)." (*Mancebo, supra*, 27 Cal.4th at p. 745.)

Similarly, no information or other pleading gave Arias notice of the life terms he could receive if convicted of attempted first degree murder. The court found the lack of notice more egregious than in *Mancebo*. "As we have pointed out, the lack of notice was greater in [Arias's case] because nothing in the information gave [him] reason to suspect the enhanced punishment statute for attempted murder applied to him." (*Arias, supra*, 182 Cal.App.4th at p. 1020.) The court rejected the Attorney General's characterization as an imperfection in the form of the pleading. "This was no mere formal defect in the information. Rather, defendant was not given notice of the special sentencing enhancement that would be used to increase his punishment from a maximum of nine years to a life term. Nor is this error reviewable under the abuse of discretion or harmless error analysis applicable to situations in which the information was amended during trial. Defendant's charging document was never amended." (*Ibid.*) In short, the prosecution had not complied with the notice requirements imposed by section 664, the defendant had no actual notice of his risk of an enhanced sentence, the life terms were stricken, and the case was remanded for resentencing. (*Arias*, at pp. 1020-1021.)

Here, the Attorney General insists the issue was forfeited, despite the flagrant deficiency in the accusatory pleading in violation of section 664, based on the holding in *Houston, supra*, 54 Cal.4th 1186. An unhappy alumnus returned to the high school he had attended three years earlier and shot and killed four people, including one of the teachers who had given him a failing grade, and wounded many others. (*Id.* at pp. 1192, 1194.) On appeal, he too argued he was improperly given life sentences because the indictment failed to allege that the attempted murders were willful, deliberate, and premeditated. (*Id.* at p. 1225.) The Supreme Court upheld the life terms on facts very different from those presented in *Arias*. The issue, it turns out, is rooted in due process concerns and the fundamental right of a criminal defendant to have sufficient notice of

21

the potential punishment he faces. In *Houston*, unlike *Arias*, the issue arose midtrial and the defendant was given explicit notice of the possible enhanced punishment. (*Houston*, at pp. 1226-1227.)

Again, the prosecution failed to comply with section 664's pleading requirement. But there the similarity ends. In *Houston*, the trial court raised the issue at the end of the first day of the defendant's presentation of his case. (*Houston, supra*, 54 Cal.4th at p. 1226.) The court discussed the issue at some length and put the defendant on notice that the verdict forms would ask the jury to distinguish the two types of attempted murder. " 'And the final thing that is not completely clear in the verdict form, because I don't think I had it clear in my mind when I was putting it together, is the distinction between the two kinds of attempted murder, and if I understand what the prosecution is doing in [the attempted murder counts], I believe the prosecution is intending to charge premeditated attempted murder. [¶] *If that's not right, you should tell me now*, or as soon hereafter as you are able to, because it would help me. [¶] In other words, the type of attempted murder [that is] punished by life imprisonment rather than five, seven, nine.' " (*Ibid*.)

A week later, the trial court announced it would include deliberate and premeditated attempted murder as a special finding. (*Houston, supra*, 54 Cal.4th at p. 1226.) After the close of evidence, the trial court instructed the jury to determine whether the attempted murders were willful, deliberate, and premeditated. (*Ibid*.) The defendant registered no objection. The Supreme Court concluded: "On the facts here, defendant received adequate notice of the sentence he faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated. A timely objection to the adequacy of the indictment would have provided an opportunity to craft an appropriate remedy. Because defendant had notice of the sentence he faced and did not raise an objection in the trial court, he has forfeited this claim on appeal." (*Id*. at p. 1228.)

The Supreme Court did not overrule *Arias*.  The court noted that the jury had been properly instructed but conceded it was unclear from the record when the trial court issued its proposed instructions and special findings and, most importantly, whether the potential life terms were discussed.  (*Houston, supra*, 54 Cal.4th at p. 1229.)  Apparently, the Supreme Court was undecided whether Arias received adequate notice, and therefore, it left the case intact.

The Attorney General maintains that defendant received notice comparable to the shooter in *Houston*.  The Attorney General points out that during a discussion whether the court should give the jury an unanimity instruction, the prosecutor mentioned, "We haven't discussed voluntary manslaughter, but let's say with the two attempted murder[s], they can find him guilty of attempted murder with premeditation or guilty of regular attempted murder, and they can disagree on for which victim it was premeditated attempted murder and which one was just normal attempted murder.  So I can see in that situation where that instruction [on unanimity] would apply."  In the Attorney General's view, in essence, the prosecution can ignore its responsibility to plead premeditated attempted first degree murder as required by section 664, and a defendant forfeits his or her right to challenge the deficiency as long as the prosecutor at some point during trial mentions or alludes to the two types of attempted murder.  Such a rule would eviscerate section 664, do violence to the meaning and rationale of *Houston*, and undermine any fair-minded understanding of notice and due process.

We begin with emphasis on the plain meaning of the statute.  The Legislature clearly states that a sentence with a maximum term of nine years cannot be enhanced to a life term unless "the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact."  (§ 664, subd. (a).)  Here no one disputes that the prosecution failed to allege the fact that the attempted murders were willful, deliberate, and premeditated.

23

Thus, according to the terms of the statute, life terms cannot be imposed. This conclusion is consistent with the holdings in *Arias* and *Mancebo*.

Nor do we believe that *Houston* dictates a different result. In *Houston*, the trial court directly and plainly informed the defendant that it was planning to instruct the jury on the two options for attempted murder. Not only did the trial court expressly raise the issue, but it invited a response from the parties. Receiving none, it again informed the defendant that it had prepared a verdict form directing the jury to make a special finding whether the attempted murders were willful, deliberate, and premeditated. Having been given notice twice during the trial that he would be subject to an attempted first degree murder verdict, the court then instructed on the additional elements necessary to find premeditated attempted murder. As a result, even though the prosecution violated section 664's directive to give the defendant advance notice in the accusatory pleading, the court found that he was given ample notice of the charges against him and the opportunity to object.

Here, by contrast, it is not even clear on the record whether defendant was present when the prosecutor, not the judge, while arguing the propriety of an unanimity instruction, made an off-hand reference to the two types of attempted murders and the possibility the jury might convict him of different degrees for different victims. Unlike the trial court in *Houston*, which clearly telegraphed the issue for the defendant, the prosecutor's brief allusion to the attempted murder counts when discussing an unrelated jury instruction did not give defendant fair notice that his sentence could jump from a maximum of nine years to a life term for each of the four counts. In short, we find *Houston* factually inapposite.

Both *Arias* and *Houston* recognize the due process implications of a failure to comply with section 664. While the Supreme Court was willing to forgive the prosecutor's transgression in *Houston*, it was precisely because the trial court had provided what the prosecutor had failed to do; that is, the court was satisfied the

24

defendant was accorded fair notice of the charges he faced and an adequate opportunity to object or to tailor his defense. In *Arias*, however, the court struck the life term when the violation of section 664 compromised the defendant's right to due process. Here, too, the violation of section 664 deprived defendant of fair notice that he would be subject to a life term if the jury found him guilty of premeditated attempted murder. Because there is no showing in this record that defendant was present, was informed of the charges against him, or that he waived his right to object, we conclude that, as in *Arias*, we must strike the four life terms. The sentence was unauthorized and we can find no forfeiture on these facts.

### III

### *Text Messages*

It is important to put defendant's next issue into context because, as framed, it appears disproportionately impactful. Five eyewitnesses identified defendant as the shooter. One of the five, Jacarri Brown, was a friend and classmate of Hayes, defendant's girlfriend. Two weeks after the shooting, Hayes gave birth to defendant's son, who was born with special needs. Apparently overwhelmed and distraught, she sent a series of text messages to Brown. She did not testify at trial.

Brown, however, did testify. He provided a detailed description of the events leading up to, and including, the shooting. It was during cross-examination that defense counsel explored Brown's relationship with Hayes, including their numerous and lengthy text messages. He asked a series of questions to expose Brown's potential bias. "Do you recall that after Tino Perez was arrested that Sara-Tessa Hayes confronted you about your identification of Tino Perez?" "And she texted you, correct?" "And you texted her back, correct?" "It wasn't just one text to her. It was more than ten texts, right?" "And they weren't short texts . . . . They were long texts, correct?" "She was accusing you of being a liar for falsely accusing Tino Perez, right?"

Brown testified Hayes, in the text messages, confronted him about his identification of defendant. He reported that Hayes "was asking me what had happened that night and she knew he was there." But he denied that she was accusing him of "being a liar for falsely accusing" defendant or for falsely identifying him. According to Brown, "[t]here came a point where she told me I was snitching and that he wouldn't have done that to me if it was the other way around." Brown assured Hayes he would help take care of the baby while defendant was in prison.

Defense counsel further probed as to why Brown had kept the text messages secret and had not divulged them to the police. When asked if he had saved the text messages, Brown stated that he was not sure. Brown found all the saved text messages and, during the lunch break, the judge and lawyers went over them. The court found some of text messages relevant, and others, irrelevant. The court then informed the jury, "So we're going to recall Mr. Brown for a limited purpose of going over some of the information in these text messages as counsel views them, that they wanted to put them in, and I have at least ruled that they are relevant in the sense that you should at least listen to them and ultimately do with them as you deem appropriate."

The prosecution thereafter recalled Brown to testify to their contents. In one text message, Hayes wrote: "Well, the man that you picked out of the lineup is my son's dad. You sent him to jail two weeks before our baby was born. You took everything away from us. My son was born underdeveloped with a lot of medical problems, so my boyfriend can't be there for a sick baby, and I can't even go back to work because it's just me to take care of my son's medical needs. They want to give Tino -- that means my son grows up without his dad. So I just thought you should know what you did to me and my family, and had it been the other way around, Tino wouldn't have gone out like no snitch. What you did was wrong. Good night."

Brown suggested that they end their conversation. Sometime later, Hayes apologized, again by text message. The messages read: "I'm sorry for everything I said

26

to you before," and "you didn't ruin my family. He ruined us himself. I was just too shortsighted and lonely to realize that. I'm just not making excuses for him anymore. He did what he did and it was wrong, just like you said," and "instead of showing concern, he changed the subject and asked me to lie and tell you that you must have recognized him from when he would come to Sac State to see me and to make sure you don't testify because they are getting ready for trial." Defense counsel registered his objections to the admissibility of all of these text messages.

Later during the trial, the prosecutor wanted to recall Brown to expand on the content of one of the text messages. The court denied the prosecutor's request.

On appeal, defendant challenges the admissibility of the text messages on four grounds: lack of foundation, hearsay, more prejudicial than probative, and an ineffective limiting instruction. Evidentiary rulings are reviewed for an abuse of discretion. (*People v. Thomas* (2011) 51 Cal.4th 449, 485.)

Defendant first contends the prosecution failed to introduce a sufficient foundation to authenticate the text messages. He complains the prosecution did not call Hayes to testify that she wrote the texts and insists that "in a technological era where impersonation is often a simple task," the admissibility of text messages raises troubling concerns about authenticity, thereby impinging on his right to due process and a fair trial. We turn to well established rules of authentication and defer to the trial court's broad exercise of discretion. (*In re K.B.* (2015) 238 Cal.App.4th 989, 995.)

While the scope of the trial court's discretion is exceedingly broad, the scope of the foundational question presented is quite narrow. "The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity

27

goes to the document's weight as evidence, not its admissibility.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.)

"Importantly, 'the fact that the judge permits [a] writing to be admitted in evidence does not necessarily establish the authenticity of the writing; all that the judge has determined is that there has been a sufficient showing of the authenticity of the writing to permit the trier of fact to find that it is authentic.' [Citation.] Thus, while all writings must be authenticated before they are received into evidence ([Evid. Code, ]§ 1401), the proponent's burden of producing evidence to show authenticity ([Evid. Code, ]§ 1400) is met 'when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]' [Citation.] The author's testimony is not required to authenticate a document ([Evid. Code, ]§ 1411); instead, its authenticity may be established by the contents of the writing ([Evid. Code, ]§ 1421) or by other means ([Evid. Code, ]§ 1410 [no restriction on the 'means by which a writing may be authenticated'])." (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1434-1435.)

Brown testified that screenshots of his phone showed "CSUS, Sara." He identified an exhibit depicting screen shots of their text messages on his phone. He also described the content of their texts in his testimony, content which supported the trial court's exercise of discretion in finding a sufficient foundation for admissibility. There was no abuse of discretion in admitting the text messages for the jury to ultimately decide on their authenticity.

Defendant also contends the text messages are inadmissible hearsay. Brown's texts do not constitute hearsay because he testified at trial and authored his own text messages. (Evid. Code, § 1200, subd. (a).) The text messages from Hayes were not admitted for the truth of the matters asserted but to rehabilitate Brown's testimony on redirect. On cross-examination, defense counsel insinuated that Brown had hopes of starting a romantic relationship with Hayes, thereby establishing a motive for misidentifying her boyfriend as the shooter and thereby removing him from the scene.

28

Without understanding the stream of text messages to provide context, the cross-examination cast doubt on Brown's credibility as an eyewitness. Thus, the trial court did not abuse its discretion by admitting the text messages for the permissible nonhearsay purpose of rehabilitating Brown's credibility. The fact the court may have also admitted the evidence on erroneous grounds is inconsequential because there was a legitimate basis for admitting the evidence. (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

Even if the evidence surmounts the authentication and hearsay obstacles, defendant maintains the trial court abused its discretion by allowing evidence that was substantially more prejudicial than probative and, therefore, violated Evidence Code section 352 and his right to due process. He argues that Hayes' representations that defendant had asked her to lie, that he was present at the party, and that he had ruined her family were unduly prejudicial, particularly because she did not testify and he did not have the opportunity to cross-examine her.

But defendant forgets that he opened the door to the admission of the text messages when, during cross-examination, he impugned Brown's credibility by creating the impression Brown had something to hide given his secret text messaging with Hayes. As previously discussed, the text messages were admitted to rehabilitate his credibility. The trial court certainly did not abuse its discretion by allowing the admission of the text messages and the questioning of Brown about them on redirect to provide the jury with the whole story and not the misleading impression defense counsel had generated during cross-examination.

Lastly, defendant contends the limiting instruction was useless. During the prosecutor's closing argument, defense counsel objected and the trial court admonished the jury that the texts were not admitted for their truth. Defendant argues the limiting instruction was given too late, and because it contradicted an earlier instruction, it was ineffectual. It is true that the court initially, after a laborious process of determining which texts were relevant and which were not, told the jurors they could "do with them as

29

you deem appropriate." We do not, however, believe the earlier comment pertaining to relevancy contaminated the court's later, careful admonition that the text messages were not admitted for their truth. The messages themselves were admissible as discussed *ante*, were not unduly prejudicial, and the limiting instruction properly guided the jury not to consider them for the truth of their comments. There was no abuse of discretion.

**IV**

***Prosecutorial Misconduct***

Defendant accuses the prosecutor of undermining the presumption of innocence, misstating the reasonable doubt standard, disparaging the defense function, and mischaracterizing the purpose for which the text messages were admitted during closing argument. The arguments, in defendant's view, constitute prosecutorial misconduct. He further argues that his lawyer and the court let him down as well; his lawyer by failing to object to the improper argument except to the prosecutor's remarks about the text messages, a dereliction of duty that deprived him of his constitutional right to competent counsel, and the trial court by denying his motion for a new trial based on the improper argument about the text messages. We find nothing deceptive or reprehensible in the closing argument and nothing so egregious it rendered the trial fundamentally unfair. As a result, his lawyer had no reason to object and the trial court properly denied the motion for a new trial.

Under federal jurisprudence, a prosecutor's misconduct constitutes a deprivation of due process when the pattern of conduct is so egregious that it infects the trial with unfairness. (*People v. Bennett* (2009) 45 Cal.4th 577, 594-595.) Under state jurisprudence, the misconduct must involve the use of deceptive or reprehensible methods to persuade the court or the jury. (*People v. Cash* (2002) 28 Cal.4th 703, 733.) When the alleged misconduct involves argument to the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-

30

of remarks in an objectionable fashion." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.)

Defendant first objects to the following argument by the prosecutor: "It's time for him to take responsibility for what he did. Because the way our justice system works is this. When you're accused of a crime, no matter how guilty you know you are, you have the right in our country to have 12 citizens from the community leave their job, leave their retirement and have to sit through a boring trial and hear the evidence. No matter how guilty you know you are. Every person in this country has that right. And you've given him that right. You've done that."

Defendant contends it is reasonably likely that the jurors understood the prosecutor's argument to mean the presumption of innocence is a farce, nothing more than a legal fiction. We disagree. The prosecutor said nothing to denigrate the presumption of innocence and no reasonable juror was likely to construe the argument in the manner defendant suggests. Based on the overwhelming evidence of guilt that the prosecutor had already laid out for the jury in meticulous detail including the five eyewitness identifications, defendant's jailhouse telephone call during which he admitted shooting four people, and his recorded police interview during which he lied to the officer, the prosecutor assured the jurors that defendant had been accorded his fundamental right to a fair trial. The prosecutor emphasized that a criminal defendant has that right to a fair trial even if he knows he is guilty. This argument does not suggest defendant is not presumed innocent, only that he retains the right to a determination of his guilt or innocence by his peers even though he may be guilty. The argument is neither deceptive nor reprehensible.

Next defendant contends the prosecutor twice misstated the reasonable doubt standard, once during his initial closing argument and again during rebuttal. The prosecutor argued: "Rule number two, you cannot go back there and play devil's advocate. This is not a game. This is a real life courtroom. You can't go back there and

31

start a sentence with 'what if.' You can't go back there and say, 'Hey, I feel that he's guilty, but let's just throw out this hypothetical.' You are judges of facts. You base your decision on the facts that you have before you."

During rebuttal, the argument spoke more directly about reasonable doubt. He explained: "Reasonable doubt. You already have the description of what reasonable doubt is. But I want to make sure we all know. It is not beyond all possible doubt. It is not I'm 100 percent sure that it happened.

"Because this is not *Back to the Future*. I can't call Marty McFly and we get into a car and we all look down and see exactly what happened. This is not *A Christmas Story* where there's Ebenezer Scrooge and we can have an angel taking us to the scene. We weren't there. So reasonable doubt is I'm 100 percent sure it happened. That is not reasonable doubt.

"You can have doubt and still find someone guilty."

We begin with the prosecutor's explanation of reasonable doubt. Many courts have admonished prosecutors not to stray from the time-tested description of reasonable doubt embodied in the standardized jury instructions. (*People v. Centeno* (2014) 60 Cal.4th 659, 667; *People v. Medina* (1995) 11 Cal.4th 694, 744-745; *People v. Johnson* (2004) 119 Cal.App.4th 976, 985-986.) Here the prosecutor reminded the jurors they had been given such an instruction. CALCRIM No. 220 states: "The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." The prosecutor then attempted to paraphrase CALCRIM No. 220 that the evidence need not eliminate all possible doubt, which is an accurate statement of the law.

But defendant contends the prosecutor's argument diluted his burden of proof by essentially suggesting the jurors did not need to be convinced defendant was guilty, and could convict him even if they had a reasonable doubt, because absolute certainty was impossible. Defendant's argument is quite a stretch; one we do not believe reasonable

32

jurors would make. Nothing in the argument or instructions hinted that the jurors did not need to be convinced that defendant was guilty. To the contrary, they were properly instructed on the prosecution's burden of proof, the elements of the offense, and, most importantly, that the instructions prevailed over any contradictory comments by the attorneys. The prosecutor's reminder, consistent with CALCRIM No. 220, that the evidence need not eliminate all possible doubt, did not mean they could find defendant guilty even if they had a reasonable doubt. Defendant's contention to the contrary is unreasonable.

The prosecutor's initial closing argument, in context, is even more innocuous. At the outset, he attempted to establish some basic ground rules for the jury to follow. The first rule, the prosecutor argued to the jury, was that they alone were the arbiters of the facts and the facts determined guilt or innocence. It is the prosecutor's second rule that has come under fire. Again the emphasis was on the jury's essential role as fact finder and he instructed the jurors to base their decision on the facts they had before them. The second rule, insofar as it embodied this basic principle, is above reproach. Where the prosecutor's argument may have been slightly misleading is when he told them not to play devil's advocate, not to ask "what if" questions, and not to throw out hypotheticals. It is true, as defendant suggests, that the jurors should ask hard questions and it is entirely appropriate for them to consider hypothetical "what ifs." But the thrust of the argument, and the reason for the prosecutor's rules, was that the jury's essential role was to decide what the facts were and those facts, not hypotheses or personal opinions, were determinative of guilt or innocence. In this context, we conclude the argument does not constitute deceptive or reprehensible conduct nor infect the trial with fundamental unfairness. At its worse, it might have been slightly confusing; but it does not come close to constituting prosecutorial error.

The prosecutor also argued that "[o]nly in the mind of a defense attorney will they say, if you didn't say it when you're in the hospital right after you got shot, then you

33

can't ever change your story. You can't ever add anything. Because if you do, that means you're lying. Only in the mind of a defense attorney would they say that." Without citation to any authority, defendant analogizes the prosecutor's disparagement of defense counsel to misstating the prosecution's burden of proof. He contends that the prosecutor was asking the jury to disregard a legitimate argument because it came from an " 'illegitimate' or 'suspect' source"—a defense attorney. Defendant is mistaken.

The prosecutor's argument had absolutely nothing to do with the burden of proof and no reasonable juror would draw such an inference. Advocates are given a wide latitude in argument, and this latitude applies to the prosecution as well as to the defense. During cross-examination the defense attorney insinuated that the eyewitness accounts provided at the hospital were more reliable than the enhanced accounts they later provided. Thus, the prosecutor was mocking the notion that any subsequent change in their descriptions indicated they were lying by stating that "only in the mind of a defense attorney" would subsequent elaboration constitute deception. Closing argument is not for the fainthearted. We find nothing untoward in the prosecutor's fiery argument and, certainly, no misconduct so serious as to jeopardize defendant's right to due process.

Finally, we return to the text message issue now in the guise of prosecutorial misconduct. In this iteration, defendant contends the prosecutor improperly argued that the text messages were true. Read in context, his argument was ambiguous. His emphasis was the important fact that Brown had first testified to the existence and content of the text messages before discovering they had been saved on his phone and the content of the messages when introduced into evidence corroborated his earlier testimony. "True" in that sense meant the text messages actually existed and they were consistent with Brown's testimony.

If, however, the argument is construed to mean the statements attributed to defendant in the messages were true, then the argument allows for the improper use of blatant hearsay. But, to his credit, defense counsel raised a timely and vehement

34

objection to the argument and insisted the misconduct merited a new trial. The trial court gave a curative limiting instruction and denied the motion for a new trial. The limiting instruction clearly and decisively distinguished between the fact the existence of the text messages was true and corroborated Brown's testimony and admonished the jury they were not to consider the truth of the hearsay evidence itself. In light of the following curative instruction there was no prosecutorial misconduct:

"Folks, what we were discussing, the text messages that you heard, I allowed them in mainly because when Jacarri Brown was on the witness stand and he was being cross-examined by [defense counsel], who asked him about his contact or lack thereof with the defendant and the defendant's girlfriend, there was some discrepancy regarding whether or not or the extent of which he had those contacts.

"And over lunch apparently he found these other texts and I allowed you to hear that just in order then to show that what Jacarri Brown testified to when he was being cross-examined by [defense counsel] was, in fact, true. All right. That he did have these contacts. I did not allow that in for its truth; i.e., that the statements attributed to the defendant in these texts were actually uttered by the defendant.

"That was only -- they were only allowed in for the purpose of supporting Jacarri's statement that he did have these exchanges with the defendant's friend because he was being asked about that by [defense counsel]. And then he had some evidence to corroborate his answers that he did have these contacts and that's why I allowed that in.

"But the statements that she attributes to the defendant at that time and that she said, those are all hearsay, so those were admitted for a limited purpose, not for its truth. I just want to make that clear."

Defendant urges us to remand the case to the trial court because the court was under the misapprehension that it had given a previous limiting instruction to the jury when it had not. A remand is unnecessary. The instruction quoted above was given immediately after the defense objected to the prosecutor's argument and promptly and

35

properly rectified any misunderstanding the argument may have generated.  We conclude the argument did not constitute misconduct, the jury was properly instructed, and the defendant received a fair trial.

## DISPOSITION

The gang enhancement and four life terms are stricken and the case is remanded for resentencing on counts one through four.  In all other respects, the judgment is affirmed.


                                                                        RAYE        , P. J.


We concur:


         BLEASE      , J.


           HULL        , J.