Filed 1/28/21  P. v. Williams CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B301325 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA144839) |
| v. | |
| VERNON WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, H. Clay Jacke, II, Judge.  Affirmed.

Maggie Shrout, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Defendant Vernon Williams was convicted of three counts of possession of a firearm by a felon, in violation of Penal Code[1] section 29800, subdivision (a)(1).  The trial court imposed an aggregate sentence of 11 years in state prison, which includes a 4-year enhancement that was imposed pursuant to section 186.22, subdivision (b)(1) (gang-enhancement provision) for one of Williams's convictions; and two 16-month enhancements imposed pursuant to the gang-enhancement provision for his other two convictions.

On appeal, Williams challenges the trial court's imposition of the gang enhancements.  In particular, Williams argues that the People failed to introduce sufficient evidence that: (1) Williams committed these offenses (a) for the benefit of, at the direction of, or in association with a criminal street gang (i.e., the Grape Street Crips), and (b) with the specific intent to promote, further, or assist in any criminal conduct by gang members; and (2) the Grape Street Crips has as one of its primary activities one or more of the criminal acts identified in section 186.22, subdivisions (e)(1) to (25) and (e)(31) to (33), such that it constitutes a "criminal street gang" for the purposes of the enhancement provision.

We reject Williams's evidentiary challenges to the gang enhancements.  First, we conclude the People offered evidence showing that in connection with at least two of his offenses, Williams possessed firearms in association with fellow gang members at a marijuana dispensary controlled by the Grape Street Crips, and that Williams committed all three offenses for the benefit of the gang to ensure that he and/or his gang affiliates

---

[1] Undesignated statutory citations are to the Penal Code.

could batter, assault, or kill any rival gang members or other adversaries who attempted to rob the establishment. Second, the testimony of the People's gang expert regarding the Grape Street Crips' primary activities was sufficient to establish that element of the statutory definition of a criminal street gang. Finding no error, we affirm the judgment.

## PROCEDURAL BACKGROUND

On March 1, 2018, the People filed an amended information charging Williams with one count of criminal threats, in violation of section 422, subdivision (a) (count 1); one count of battery with injury on a peace officer, in violation of section 243, subdivision (c)(2) (count 3); two counts of resisting an executive officer, in violation of section 69 (counts 4 and 5); one count of violating a criminal street gang injunction, in violation of section 166, subdivision (a)(9) (count 6); three counts of possession of a firearm by a felon, in violation of section 29800, subdivision (a)(1) (counts 7, 8, and 10); and one count of attempting to dissuade a witness, in violation of section 136.1, subdivision (a)(2) (count 11).[2] The amended information included an allegation under the gang-enhancement provision for counts 7, 8, and 10. Williams pleaded not guilty on all counts and denied all allegations.

In July 2018, a jury acquitted Williams of counts 1 and 6 but deadlocked on the remaining counts. The trial court later dismissed counts 3, 4, and 5 pursuant to section 1385.

---

[2] The amended information does not contain a count 2 or a count 9. Additionally, the trial court later amended count 3 such that it alleged a violation of section 243, subdivision (b) instead of section 243, subdivision (c)(2).

3

At the conclusion of Williams's second trial in January 2019, the jury acquitted Williams of count 11, but found him guilty on counts 7, 8, and 10, and found true the gang-enhancement allegation for each of these three offenses.

On July 16, 2019, the trial court sentenced Williams to prison for an aggregate term of 11 years. Specifically, the trial court imposed a term of 3 years on count 7 along with a 4-year consecutive term under the gang-enhancement provision, a consecutive prison term of 2 years that is comprised of 8 months for count 8 along with a 16-month term pursuant to the gang-enhancement provision, and another consecutive term of 2 years that consists of 8 months for count 10 plus 16 months in accordance with the gang-enhancement provision. Williams timely appealed the judgment on September 12, 2019.

## FACTUAL BACKGROUND

We summarize only those facts that are relevant to this appeal.

### 1. Officer Paiz's encounter with Williams on June 13, 2017

On June 13, 2017, Officer Jeremy Paiz of the Los Angeles Police Department (LAPD) and his partner were on patrol. While Officer Paiz was driving his police vehicle, he saw Williams walk out of a marijuana dispensary, look at the police vehicle, grab his right front pocket, and run back inside the dispensary. The two officers thereafter attempted to enter the dispensary, but the door was locked. Officer Paiz could see Williams and several other persons inside the business, and noticed that Williams had a bulge in his right front pocket that Officer Paiz believed was a firearm.

4

After additional officers arrived at the scene, the police surrounded the building and ordered Williams and the other occupants to come out of the dispensary. Approximately 30 persons exited the dispensary, including Williams. The police did not find a weapon on any of these individuals. Officer Paiz later found a handgun in a dumpster in the parking lot behind the dispensary. As discussed in the Factual Background part 2.c, *post*, Detective Daniel Pearce subsequently obtained surveillance footage from the dispensary showing that Williams possessed one or more firearms at the establishment on June 10, 11, and 13, 2017.

## 2. Detective Pearce's expert testimony

At trial, Detective Daniel Pearce testified as the People's gang expert and as an investigating officer. Detective Pearce joined the LAPD's Southeast Division in 2004, and he was assigned to the Southeast gang impact team as a gang detective from 2008 to 2011, and again from late 2015 or early 2016 until late 2018. From 2005 until late 2018, Detective Pearce focused on investigating gang activity.

During Detective Pearce's investigations, he "talked to countless witnesses of crime, victims of crime, [and] gang members who commit crime." Additionally, Detective Pearce has spoken to over 100 Grape Street Crips gang members during the course of his career. Several of those gang members were "cooperative" and "provided [Detective Pearce] with information kind of behind the scenes about ongoing Grape Street [Crips] activities."

### a. *The Grape Street Crips and Gangs Generally*

The Grape Street Crips gang has an informal hierarchical structure. "Young homies" are the "very active" gang members who commit various violent crimes and property offenses and are usually between 12 and 21 years of age. "Big homies," "the most influential person[s] . . . within the gang," are individuals who are "25 to 35 years of age" and "have demonstrated a loyalty to the gang with committing multiple crimes" and refusing to "snitch on the gang" (i.e., cooperate with law enforcement). The O.G.s are "above" the big homies; O.G.s have "retired from the active gang lifestyle" and are 35 to 50 years old.

At the time Williams's second trial was held in January 2019, Detective Pearce had known Williams for approximately 13 years, and during that timeframe, Williams had become a "big homie" in the Grape Street Crips gang. Williams has several tattoos associated with the Grape Street Crips gang, including a tattoo with the letters "L" and "C" and another tattoo depicting an Uzi with the words "Costa Nostra" below it. Williams's monikers are "Double Deuces," "Dub," and "Big Dub."

The Grape Street Crips gang claims as its territory the Watts Neighborhood of Los Angeles, a neighborhood that includes the Jordan Downs housing project; Detective Pearce was assigned to the area in and around Jordan Downs in 2005. Generally, a gang will claim a territory as its own in order to have a place at which to "hang out, sell drugs, commit crimes, [and] to meet, . . . congregate, [and] defend." The Grape Street Crips gang uses guns to "defend the gang territory" and "intimidate people." Detective Pearce testified that if a gang member is in his gang's territory and possesses a weapon, "it's important for a majority of

6

the [gang], if not every member[,] to know if there is a gun and where it is" "[b]ecause at any given time[,] should another gang try to rob or shoot at the home gang, it is incumbent upon all the gang members to do their part to defend either their territory or the business . . . ." Detective Pearce testified that in "gang culture," it is not "acceptable to call the police" "[i]f you th[ink] that someone [is] there coming to hurt you"; a gang member is instead "expected to handle those kinds of threats" himself.

When the prosecutor asked Detective Pearce to identify "the primary activities of the Grape Street Crips," Detective Pearce responded, "Shooting people, killing people, robbing people, intimidating people, selling drugs, breaking into people's homes, crimes such as that." Detective Pearce answered in the affirmative when the prosecutor asked whether "intimidating people" included criminal threats and intimidating witnesses.

b.     *The Dispensary and Wiretapped Telephone Calls*

Prior to his involvement in the instant case, Detective Pearce knew about the marijuana dispensary in question because he had served search warrants at the establishment on several occasions. Based on his "background, training and personal experience," Detective Pearce opined that this dispensary was "connected to" and "run[ ]" by the Grape Street Crips in June 2017.[3] Additionally, Detective Pearce stated that "[t]here

---

[3] For instance, Detective Pearce testified that the surveillance footage discussed later in this opinion showed that the shop contained a mural depicting a deceased and well-respected member of the Grape Street Crips. Detective Pearce testified that the presence of the mural at the business indicated

7

was a tremendous amount of crime coming out of that weed shop." Detective Pearce recalled seizing "drugs, guns, [and] video" from the dispensary on multiple occasions.

The dispensary was not located in territory claimed by the Grape Street Crips, but was instead within an area claimed by the 89 Family Swan Bloods gang. Although Detective Pearce was not aware of "any issues" or "problems" between the Grape Street Crips and the 89 Family Swan Bloods, he stated that the two gangs are "[t]raditionally . . . enemies" of one another "because the Swans are Bloods and the Grape Street [members] are Crips." Detective Pearce also observed that the dispensary was "essentially surrounded by two Blood gangs who were rivals" of each other, given that the 89 Family Swan Bloods gang claimed territory to the north of the dispensary and the BOP Bloods gang claimed the area to the south of the establishment. Detective Pearce opined that the dispensary was "susceptible to being robbed by rival gangs," and that guns constituted a "fundamentally important" means of defending this territory from the Grape Street Crips gang's rivals. Detective Pearce also testified that marijuana shops in Watts are "frequently robbed," and that a dispensary in Watts may need guns for its defense even if that particular shop did not have "any gang connection."

At trial, the People played recordings of several telephone calls that were collected in connection with a wiretap investigation conducted in a separate case; Williams concedes that in several of these telephone calls, he "discuss[ed] the gang

---

that the dispensary had "[a] strong association with the Grape Street Crips."

[(i.e., the Grape Street Crips)] and us[ed] gang language."[4] In a December 5, 2017 telephone call, Williams indicated he was concerned because someone with a gun had been seen outside the marijuana dispensary. Williams remarked, "That man a danger to somebody . . . . He a danger to our life. No he a danger to our dispensary and to somebody life." Williams also stated, "I had the green light to get out of there to get to something, because you know, we don't have nothing in here." Detective Pearce opined that the "something" Williams referred to in the call was a gun.[5]

### c. *The Offenses at Issue*

On June 14, 2017, Detective Pearce and other LAPD officers executed a search warrant at the dispensary and seized a digital video recorder (DVR) from the establishment. The DVR preserved roughly 10 days of footage recorded from

---

[4] Although the audio recordings are not in the record before us, a transcript of the calls was included in the record.

[5] While Williams at one point states in his appellate briefing that this call was "purportedly made by" him, he does not dispute that the People offered evidence showing that he participated in this telephone call and that he made the statements attributed to him in the textual paragraph accompanying this footnote. (See *Reygoza v. Superior Court* (1991) 230 Cal.App.3d 514, 519 & fn. 4 [criminal case in which the Court of Appeal assumed that an assertion made by respondent was correct because the "defendant did not dispute respondent's claim in his reply"]; *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].)

9

16 surveillance cameras located inside and outside of the shop. Excerpts of the footage from the seized DVR were played for the jury at trial.[6]

On June 10, 2017, Williams and two Grape Street Crips gang members (Keyon Faulkner and Deshawn Raspberry), exited a vehicle parked outside the dispensary and entered the establishment. While Williams was inside the dispensary, he placed "what appeared to be [a] firearm" with an extended magazine into his waistband, and he shortly thereafter put it in a bag that appeared to have another firearm inside of it. Next, Williams left the bag in the dispensary's parking lot, and Raspberry retrieved the bag from the lot and dropped it into a Buick; that car then "immediately" drove away from the business. A person operating a Cadillac drove off toward the Buick, and Williams entered a vehicle and followed the Cadillac. Detective Pearce testified that Williams and the drivers of the other vehicles were using a gang tactic called a "caravan"—i.e., the vehicle transporting the guns is followed by one or more vehicles that will distract police officers and ensure that "the car with the guns is free to go [to] wherever the destination is." Detective Pearce has seen Grape Street Crips gang members use the caravan tactic.

On June 11, 2017, while Williams was in the manager's office at the dispensary, he picked up a Glock firearm, removed the magazine from the gun, examined the magazine, and put the gun down just out of view of the surveillance camera. Later that

---

[6] Because these excerpts of the footage are not in the record before us, we rely on Detective Pearce's testimony for the contents of the video. The next three paragraphs in this section summarize Detective Pearce's descriptions of the footage.

day, Williams picked up the handgun and placed it in a drawer located in the office.

Approximately 45 minutes to an hour before Officer Paiz arrived at the dispensary on June 13, 2017, Martell Perry took a Beretta handgun equipped with a laser sight out of his jacket pocket and handed the weapon to Williams.[7] The weapon thereafter ended up in the hands of a Grape Street Crips gang member named Marquis Goss, and Faulkner later held the weapon. Faulkner put the gun down, Williams picked it back up, and Williams handed the gun to Perry again. Perry later placed the handgun in a dumpster located in the parking lot of the dispensary.

The People posed a lengthy hypothetical question to Detective Pearce: "[P]lease assume that we're talking about a long-time member of the Grape Street Crips who is considered or reached the status of 'big homie.' [¶] . . . In June of 2015 the Grape Street Crip big homie is helping to manage a marijuana dispensary in the area of 90th and South Central Avenue in the City and County of Los Angeles in the territory of a rival blood gang. [¶] First, on June 10 that same big homie is involved in trading handguns for marijuana and potentially other things, acting with at least two other Grape Street gang members and they use the main office of the dispensary as the trade location. [¶] And the next day the same gang member possesses a handgun with an extended magazine in the main . . . office of that same dispensary. [¶] And on June the 13th, three days after the first incident, the same big homie possesses a handgun at that

---

[7] Detective Pearce testified that, "based on the video evidence" offered at trial, he believed that Perry was "at the very least" an associate of the Grape Street Crips.

11

marijuana shop, holding it at least two times and being aware of it in the shop for over an hour.  That same weapon being trading [*sic*] amongst at least two other Grape Street gang members on that day inside the dispensary.  [¶]  Assuming all those facts, can you tell us if the conduct in the hypothetical[ ] was . . . done for the benefit of or in association of [*sic*] the Grape Street Crips?”

Detective Pearce opined that the conduct described in the hypothetical was done for the benefit of, and in association with, the Grape Street Crips.  He testified that this conduct was done in association with the gang because “the gang member is with other gang members[ ] and . . . at a gang hangout, the weed dispensary.”  Detective Pearce further testified that “it benefits the gang when a gang member has a gun to defend himself and the gang at a marijuana dispensary or any type of business outside the gang area. . . .  [G]angs need guns fundamentally for protection and to intimidate people and to kill people when needed.”

## STANDARD OF REVIEW

“ ‘In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.’ ” (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 656–657 (*Ochoa*).)  In conducting this analysis, the reviewing court must “view[ ] all the evidence in the light most favorable to the prosecution, and draw[ ] all reasonable inferences in favor of the jury’s findings.”  (See *People v. Perez* (2017) 18 Cal.App.5th 598, 607 (*Perez*).)

12

"[W]e *must* begin with the presumption that the evidence . . . *was* sufficient, and the defendant bears the burden of convincing us otherwise. . . . [¶] . . . [A]n appellate court is 'not required to search the record to ascertain whether it contains evidence that will sustain [the appellant's] contentions.' [Citation.] . . . [¶] . . . [T]he defendant must set forth in his opening brief *all* of the material evidence . . . in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict." (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573–1574.)

This substantial evidence standard applies to sufficiency-of-the-evidence challenges to enhancements imposed pursuant to section 186.22, subdivision (b)(1). (See *Ochoa*, *supra*, 179 Cal.App.4th at pp. 656–657.)

## DISCUSSION

Section 186.22, subdivision (b)(1) authorizes the trial court to enhance a defendant's prison sentence if he or she committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (See § 186.22, subd. (b)(1).)

For the purposes of section 186.22, subdivision (b)(1), " 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e) [of section 186.22], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang

13

activity." (See § 186.22, subd. (f).) Criminal acts that may constitute primary activities of a criminal street gang include: "Assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245"; "[r]obbery, as defined in Chapter 4 (commencing with Section 211) of Title 8"; "[u]nlawful homicide or manslaughter, as defined in Chapter 1 (commencing with Section 187) of Title 8"; "[t]he sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances as defined in Sections 11054, 11055, 11056, 11057, and 11058 of the Health and Safety Code"; "[t]he intimidation of witnesses and victims, as defined in Section 136.1"; and "[b]urglary, as defined in Section 459." (§ 186.22, subds. (e)(1)–(e)(4), (e)(8), (e)(11).)

Williams argues the People failed to offer sufficient evidence that: (1) Williams possessed a firearm on the three occasions in question (a) for the benefit of, at the direction of, or in association with a criminal street gang, (b) with the specific intent to promote, further, or assist in criminal conduct by gang members; and (2) the Grape Street Crips gang has, as one of its primary activities, the commission of one or more of the criminal acts identified in section 186.22, subdivisions (e)(1) to (e)(25) and (e)(31) to (e)(33). For the reasons discussed below, we reject each of these contentions.

14

**A.    There Is Substantial Evidence that Williams Committed the Instant Offenses for the Benefit of, at the Direction of, or in Association with, a Criminal Street Gang with the Specific Intent to Promote, Further, or Assist in Criminal Conduct by Gang Members**

We first address whether there was sufficient evidence that Williams possessed the firearms in question in association with the Grape Street Crips.  As we noted in the Factual Background, in the course of responding to a hypothetical scenario based on the facts of this case, Detective Pearce opined that the "big homie" described therein possessed firearms in association with the Grape Street Crips because "th[at] gang member [was] with other gang members[ ] and . . . at a gang hangout, the weed dispensary."  Detective Pearce had previously testified that Faulkner, Raspberry, and Goss were Grape Street Crips gang members who—according to the surveillance footage—were present at the dispensary on June 10 and/or 13, 2017 and had handled one or more of the firearms that Williams unlawfully possessed.  As far as we can discern, Williams seems to argue that no reasonable jury could have relied on Detective Pearce's testimony identifying these individuals as Grape Street Crips gang members because the detective did "not explain if that information is based on personal knowledge or inadmissible hearsay."  Williams thus suggests that Detective Pearce's testimony is " 'purely conclusory and factually unsupported . . . .' "

As the Attorney General correctly points out, Detective Pearce testified that he investigated gangs for over 10 years, he had previously been assigned to the area claimed by the Grape

15

Street Crips, he spoke to "countless" victims of crime, and he discussed the Grape Street Crips gang's activities with over 100 of its members. Williams does not contend that this experience is an insufficient foundation for Detective Pearce's testimony regarding Faulkner's, Raspberry's, and Goss's membership in the gang. Rather, it appears Williams complains that Detective Pearce did not *explicitly* connect his testimony identifying these men as gang members with the detective's investigative experience, such that this testimony could have been "based on personal knowledge or inadmissible hearsay."

Williams misapprehends the standard of review. "We must presume all intendments and presumptions in favor of the judgment, and ' " 'on matters as to which the record is silent, . . . error must be affirmatively shown.' " ' " (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139 (*Anthony*).)

If Williams believed that Detective Pearce's testimony regarding the gang membership of these three individuals was speculative, then it was incumbent on him to cross-examine Detective Pearce on that point during the proceedings below. On this record, however, we must presume that Detective Pearce's testimony on this point was based on his experience investigating the Grape Street Crips, and not on some unspecified inadmissible evidence. (Cf. *Anthony*, *supra*, 32 Cal.App.5th at pp. 1139–1140 [invoking the presumption in favor of the judgment to reject a hearsay challenge to the admission of certain expert testimony because the record did not disclose the underlying source of the expert's testimony].) Further, we note the detective testified that on June 10, 2017, Williams and other persons visiting the dispensary used a gang tactic designed to prevent the police from finding the handgun (i.e., the caravan tactic), which further

16

indicates that Williams possessed that weapon in association with his gang.

Thus, there was substantial evidence that Williams committed at least the June 10 and June 13, 2017 possession offenses "in association with" the Grape Street Crips.

Next, we turn to whether there was sufficient evidence that Williams possessed the firearms on the three dates at issue here for the benefit of the Grape Street Crips gang and with the specific intent of promoting, furthering, or assisting in criminal conduct by its members. According to Detective Pearce's testimony, the surveillance video showed that Williams possessed one or more handguns on three separate occasions at a dispensary that was connected to, and run by, the Grape Street Crips. The detective also testified that the dispensary was "susceptible to being robbed by rival gangs" in part because it was not located in territory claimed by the Grape Street Crips and was "essentially surrounded by two Blood gangs" that are "traditional[ ]" enemies of the Grape Street Crips. Furthermore, as discussed above, there was substantial evidence that on at least two occasions, Williams possessed a firearm at the dispensary in association with other members of the gang. Additionally, a reasonable jury could have found that during the December 5, 2017 telephone call discussed previously, Williams expressed an interest in securing a firearm to protect the dispensary. (See fn. 5 and its accompanying paragraph, *ante*.)

Under these circumstances, the jury could reasonably have inferred that Williams possessed one or more firearms on the three dates in question to benefit the Grape Street Crips by ensuring that a business run by the gang would not be robbed. Similarly, a reasonable jury could have also found that Williams

17

possessed these firearms with the specific intent to promote, further, or assist the criminal conduct of the gang's members because the availability of a firearm at the dispensary would allow Williams or his confederates to use the weapon to batter, assault, or commit a homicide offense against any rival gang member or other aggressor who attempted to rob the dispensary. Indeed, as explained in Discussion part B, *post*, shooting people, killing people, and intimidating people are some of the gang's primary activities.

Williams nonetheless insists that this evidence was not sufficient to show that he possessed the guns in question to "defend . . . gang territory" because it was possible he had these weapons "at the dispensary for the non-gang reason of protecting the marijuana, cash, and people that worked there" and "a marijuana dispensary in [this area] would need a gun even if [it] was not gang affiliated."

Williams apparently ignores the evidence that the dispensary did belong to the Grape Street Crips at that time, including the surveillance footage showing that Williams possessed the weapons in association with Grape Street Crips gang members on multiple occasions at the establishment; the presence of a mural of a well-respected and deceased Grape Street Crips gang member at the business (see fn. 3, *ante*); and, of course, Detective Pearce's testimony that the dispensary was connected to, and run by, the gang (testimony that was presumptively based on his extensive experience investigating this gang). Because a court assessing a sufficiency-of-the-evidence challenge must "draw[ ] all reasonable inferences in favor of the jury's findings," (see *Perez*, *supra*, 18 Cal.App.5th at p. 607), we reject Williams's mere argument that even though

18

there was evidence the dispensary belonged to the gang, he somehow committed these crimes for solely his "own personal benefit" and not to further the interests of the Grape Street Crips.

**B.    There Is Substantial Evidence that the Grape Street Crips Satisfies the "Primary Activities" Element of the Statutory Definition of a "Criminal Street Gang"**

As we noted earlier in this opinion, when Detective Pearce was asked to identify "the primary activities of the Grape Street Crips," he responded:  "Shooting people, killing people, robbing people, intimidating people, selling drugs, breaking into people's homes, crimes such as that."  Williams contends that, "like the expert in *In re Alexander L.* [(2007) 149 Cal.App.4th 605 (*Alexander L.*), whose testimony did not constitute substantial evidence on the primary activities element], there is no information on whether [Detective Pearce's] list of the gang's primary activities was based on his own investigations, court records of convictions, or inadmissible hearsay," and "[n]o specifics were elicited as to the circumstances of the crimes he listed, or where, when, or how the expert had obtained the information."  Thus, Williams seems to argue that Detective Pearce's testimony on this point was too "conclusory" for the jury to infer reasonably that these crimes are among the Grape Street Crips gang's primary activities.

Detective Pearce's testimony regarding the primary activities of the Grape Street Crips is clearly distinguishable from the gang expert's testimony in *Alexander L.*  There, when the gang expert was asked about the primary activities of the gang in question, "he replied:  'I know they've committed quite a few assaults with a deadly weapon, several assaults.  I know

19

they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (See *Alexander L.*, *supra*, 149 Cal.App.4th at p. 611.) The Court of Appeal concluded that this testimony was insufficient because "[n]o specifics were elicited as to the circumstances of these crimes, or where, when or how [the expert] had obtained the information[,] [h]e did not directly testify that criminal activities constituted [the gang's] primary activities," and, "[e]ven if [the panel] could reasonably infer that [the expert] meant that the primary activities of the gang were the crimes to which he referred, his testimony lacked an adequate foundation." (See *id.* at pp. 611–612.) In particular, the *Alexander L.* court observed that it could not "know whether the basis of [the expert's] testimony on this point was reliable, because information establishing reliability was never elicited from him at trial" and, thus, "[i]t [was] impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (See *id.* at p. 612.)

In contrast, Detective Pearce identified expressly the aforementioned crimes as the Grape Street Crips gang's primary activities, and, as discussed in more detail in Discussion part A, *ante*, the detective offered testimony showing that he had extensive experience investigating the Grape Street Crips. Thus, unlike the expert in *Alexander L.*, Detective Pearce had set forth an adequate foundation for his testimony regarding whether the gang's " ' "chief" or "principal" occupations' " include the crimes listed earlier. (See *Alexander L.*, *supra*, 149 Cal.App.4th at p. 613 [noting that a gang's primary activity is its chief or principal occupation, and that an officer's " 'conversations with the defendants and with other [gang] members, his personal

investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies' " may constitute an adequate foundation for testimony regarding that gang's primary activities].)

Williams resists this conclusion and argues that "Detective Pearce did not offer whether his list of the gang's primary activities was based on his own investigations, court records of convictions, or inadmissible hearsay." Once again, in accordance with the applicable standard of review, we presume that Detective Pearce's testimony concerning the gang's primary activities was drawn from the vast investigative experience he described during his testimony, and not on some unknown inadmissible source. (See *Anthony*, *supra*, 32 Cal.App.5th at pp. 1139–1140.)

Williams also contends that evidence introduced at trial showing that two Grape Street Crips gang members were convicted of certain offenses identified in section 186.22, subdivision (e) (e.g., murder and criminal threats) does not establish that these criminal acts are the primary activities of the gang. Because Detective Pearce's testimony in and of itself constitutes substantial evidence of the Grape Street Crips gang's primary activities, we need not address this argument further. (See *Alexander L.*, *supra*, 149 Cal.App.4th at p. 611 [" 'Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.' [Citation.] Expert testimony based on an adequate factual foundation might also be sufficient."].)

21

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

CHANEY, J.

FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.