Filed 3/23/21  P. v. Castillo CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HECTOR CASTILLO,<br><br>    Defendant and Appellant. | B301982<br><br>(Los Angeles County<br>Super. Ct. No. BA438393) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ray G. Jurado, Judge.  Affirmed as modified.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Hector Castillo was convicted of one count of first degree murder, one count of shooting at an occupied motor vehicle, and two counts of unlawful possession of a firearm. The jury found true gang enhancement allegations relating to all four offenses, and it also found true firearm enhancement allegations pertaining to the murder and shooting at an occupied motor vehicle convictions. The trial court sentenced Castillo to an aggregate prison term of 50 years to life, with a minimum parole eligibility date of 15 calendar years. The lower court also imposed, but stayed, certain prison terms, including two 10-year gang enhancements.

On appeal, Castillo alleges claims of prosecutorial misconduct, the erroneous exclusion of evidence supporting his theories of imperfect self-defense and third-party culpability, instructional error, the erroneous denial of his motion to bifurcate the gang allegations from the trial of the underlying substantive offenses, insufficiency of the evidence supporting the gang allegations, and cumulative error. Castillo further contends that the trial court erred in imposing the 15-year minimum parole eligibility date and the two 10-year gang enhancements.

Castillo's prosecutorial misconduct claims fail because he has not demonstrated that he was prejudiced by the People's actions. We also reject his challenge to the trial court's evidentiary ruling and his claim of instructional error because his characterizations regarding the excluded evidence giving rise to those claims are unsupported by the record. His challenges to the denial of his bifurcation motion and to the sufficiency of the evidence fail because the People offered evidence showing that Castillo shot a rival gang member in territory claimed by Castillo's gang in order to defend that territory and avenge the

murder of Castillo's brother, who was a member of his gang. Castillo's cumulative error claim does not warrant reversal because, aside from his allegations of prosecutorial misconduct, we explicitly pass upon and reject the merits of his claims of trial error. Lastly, although we accept the parties' concession that the two 10-year gang enhancements should be stricken, we disagree with Castillo's contention that the trial court's imposition of the 15-year minimum parole eligibility date was unauthorized. We thus affirm the judgment as modified.

## PROCEDURAL BACKGROUND

On September 28, 2016, the People filed an information charging Castillo with one count of murder, in violation of Penal Code[1] section 187 (count 1); one count of shooting at an occupied motor vehicle, in violation of section 246 (count 2); one count of unlawful possession of a firearm, in violation of section 29805 (count 3); and another count of unlawful possession of a firearm, in violation of section 29815, subdivision (a) (count 4). With regard to counts 1 and 2, the information alleged that Castillo personally and intentionally discharged a firearm causing great bodily injury for the purposes of section 12022.53, subdivision (d). Additionally, the information averred that Castillo committed all four offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. Castillo later pleaded not guilty to all counts.

---

[1] Undesignated statutory citations are to the Penal Code.

3

On February 21, 2019, the jury found Castillo guilty of first degree murder and of all other charged offenses, and found the gang and firearm enhancement allegations to be true.

On October 22, 2019, the trial court sentenced Castillo to an aggregate prison term of 50 years to life. The sentence is comprised of a term of 25 years to life on count 1, with a consecutive sentence of 25 years to life imposed on that count pursuant to section 12022.53, subdivision (d); the court imposed, but stayed pursuant to section 654, a 10-year concurrent enhancement on count 1 pursuant to section 186.22, subdivision (b)(1)(C). Pursuant to section 186.22, subdivision (b)(5), the trial court ruled that Castillo could not be paroled until he had served a minimum of 15 years of his prison sentence. The court also imposed prison terms for counts 2, 3, and 4, but stayed each of those sentences pursuant to section 654. Of particular note for the instant appeal is the sentence imposed for count 2, which was a 7-year prison term, along with: a 10-year enhancement pursuant to section 186.22, subdivision (b)(1)(C); an indeterminate life sentence pursuant to section 186.22, subdivision (b)(4); and a 25-year enhancement pursuant to section 12022.53, subdivision (d).

Castillo timely appealed the judgment.

## FACTUAL BACKGROUND

This part summarizes relevant portions of (a) testimony offered by the People's witnesses, and (b) the defense's theory of the case.

4

## 1.     The People's Evidence

### A.     The Shooting and Its Aftermath

On March 21, 2015, Rosario Marban lived at a home on Eastlake Avenue in Los Angeles (Marban residence) with his family, including his son, Alberto Marban.[2]  A family gathering was taking place at the house that evening.  When Oscar Rivera arrived at the Marban residence, he walked through an archway and saw two persons sitting on chairs outside the house; Rivera later made his way to the backyard, as did Rosario.  While they were in the backyard that evening, Rivera and Rosario heard gunshots.

Christian Lepe was driving on Minnesota Street near Eastlake Avenue when he heard gunshots and saw a car that had flipped over.  Lepe parked his vehicle and saw a man inside the other car who was not moving.

At 6:54 p.m., two police officers responded to a shooting reported at an address located near the Marban residence.  After arriving at that location, one of the officers saw a white sport utility vehicle (SUV) that had flipped over onto its passenger side.  A Lincoln Heights gang member named David Cardiel was the sole occupant of the SUV.[3]  Cardiel had sustained multiple

_____

[2]  For the sake of clarity, and meaning no disrespect, we will use first names when referring to members of the Marban family.  Additionally, we note there is no dispute that Castillo was Alberto's "childhood friend."

[3]  The parties do not dispute the People offered evidence that Cardiel had tattoos consistent with membership in the Lincoln Heights gang.

gunshot wounds to his face and body, and was pronounced dead at the scene. Police found no firearms on Cardiel.

Officers thereafter canvassed the area north of the scene of the shooting. The officers subsequently asked the occupants of the Marban residence to exit the home, and then conducted a sweep of the dwelling for suspects.

One of the officers went upstairs to Alberto's bedroom, where the officer found Castillo lying face down on a bed. Castillo, who was breathing heavily and sweating, was taken into custody.[4]

A detective entered a bathroom in the home, examined a trash can, and found therein a pair of jeans, a Los Angeles Dodgers baseball cap, and a damp shirt that had been turned inside out. Inside the pocket of the jeans were three identification cards that bore Castillo's name, including a California identification card. The detective used the same gloves to remove each item of clothing from the trash can.

As Alberto saw the police remove Castillo from the Marban residence, Alberto noticed that Castillo was wearing Alberto's shirt. At trial, Alberto claimed that although he had seen Castillo on the morning of March 21, 2015, Castillo did not come to family gathering. Alberto further claimed that he did not give Castillo permission to wear Alberto's shirt or enter his bedroom. Alberto also insisted that the clothing found in the bathroom trash can did not belong to him, and that he did not place those articles of clothing in the trash can.

---

[4] Police found a 7.62-caliber rifle bullet on the bedroom floor. Alberto's testimony indicates that he found the bullet at a park prior to the shooting and placed it on the floor of the bedroom.

An officer conducted a protective sweep of the backyard of the Marban residence, and found a rifle on the hill by the fence line.[5] The magazine contained four live bullets, and the chamber contained one bullet. A glove was found under the rifle. An opening along the fence led to a neighbor's property. Police also "recovered three cartridge casings, two of which were on the landing between two staircases in front of the residence, a Monster energy drink can in the front yard, and a red spray paint can in a planter."[6]

One of the officers investigating the shooting noticed that the words "Eastlake 1" and "Swifty" appeared in red paint on a wall across the street from the Marban residence. The officer testified that he could smell paint in the air in the vicinity of the wall, and that this smell indicated that someone had recently spray-painted the graffiti.

---

[5] For the purposes of this appeal, Castillo concedes that this was the weapon that was used to shoot Cardiel. (See *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 (*Artal*) [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party. [Citations.]' "].)

[6] The Attorney General asserts, and Castillo does not dispute, that evidence to this effect was introduced at trial. (See *Reygoza v. Superior Court* (1991) 230 Cal.App.3d 514, 519 & fn. 4 [criminal case in which the Court of Appeal assumed that an assertion made by respondent was correct because the "defendant did not dispute respondent's claim in his reply"]; *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].)

## B.    Forensic Evidence

The shell casings found at the scene of the shooting were fired from the rifle found in the backyard of the Marban residence.  The weapon was a 7.62 by 39-millimeter caliber rifle.

Gunshot residue (GSR) is a group of microscopic particles that are formed when a firearm is discharged.  GSR is comprised of three elements:  lead, antimony, and barium.  A "characteristic particle" contains all three aforesaid elements.  If a characteristic particle is found on a person, then there are four possible explanations for that phenomenon:  (1) that person discharged a firearm, (2) the individual was in the general vicinity of a firearm being discharged, (3) the person touched something that had GSR on it, or (4) something with GSR thereon touched that person.  For instance, "when a police officer handcuffs someone, [that officer] could be a source of introducing . . . a characteristic particle onto someone's hands . . . ."  Additionally, an "indicative particle" typically contains only two of the three elements found in GSR, and could "possibly come from . . . environmental sources" other than the firing of a gun.

One characteristic particle was found on Cardiel's left hand.  A characteristic particle was also found on Castillo.  Although no GSR was detected on Alberto, six indicative particles were found on him.

Detectives obtained DNA samples from Castillo and Alberto.  DNA swabs were taken from the rifle, hat, shirt, and jeans seized on March 21, 2015.  The rifle's trigger, trigger guard, wood stock, wood grips, and bolt were swabbed for DNA.

Alberto was the major contributor of the DNA found on the hat.  Castillo was the major contributor of the DNA found on the shirt and jeans, and he was the single contributor of the partial

8

DNA profile found on the rifle. The People's DNA examiner testified that he could not ascertain which part of the rifle the partial DNA profile came from, and that the DNA could have come from any part of the weapon that had been swabbed. Although the examiner could not say with certainty that direct human contact with the rifle is the only means by which the DNA could have been left thereon, he testified that "the easiest and most common way that DNA transfers . . . is by direct, primary handling of an item."

The random-match probability of the profile from the rifle was one in a hundred billion unrelated people.

### C. Gang Evidence

Eastlake is a gang that had 75 documented members in 2015, 20 to 25 of whom lived in the area where the shooting occurred. The Eastlake gang's primary activities include possession and sales of narcotics, possession of weapons, assaults with a deadly weapon, shootings, and homicides. The shooting occurred in territory claimed by the Eastlake gang.

Los Angeles Police Officer Juan Cobian testified as a gang expert for the People. Officer Cobian testified that Castillo was a self-identified Eastlake gang member who used the moniker "Swifty." Castillo also made recorded telephone calls from jail in which he identified himself as "Swifty." Castillo had tattoos with the words "Lakers" and "East," which were indicative of membership in the Eastlake gang.

Castillo also has a tattoo that reads, "Rest in Peace, Little Toker." Castillo's younger brother, Juan Castillo, was a member of the Eastlake gang who had the moniker "Toker." Juan Castillo had been fatally shot in 2010. Rosa Ramirez, Castillo's cousin, testified that Castillo told her he believed that his brother, Juan,

9

had been killed by the Lincoln Heights gang. No Lincoln Heights gang member was prosecuted for the killing.

It is undisputed that Cardiel was a member of Lincoln Heights, a gang that has approximately 120 members. Lincoln Heights has a violent rivalry with the Eastlake gang. In March 2015, the two gangs "were fighting[, t]hey were shooting at each other[, t]hey were attacking each other's territory[,] and . . . . going through each other's territory and disrespecting each other . . . ." In Officer Cobian's opinion, an Eastlake gang member would be expected to defend his gang's territory from a rival gang member who entered that territory. Officer Cobian opined that the discovery of graffiti with the words "Eastlake" and "Swifty" indicated that an Eastlake gang member was claiming his territory.

In Officer Cobian's opinion, the shooting benefited the Eastlake gang because it created an atmosphere of intimidation in the community, and because Castillo, an Eastlake gang member, believed his brother had been killed by the Lincoln Heights gang. Additionally, Officer Jorge Alfaro, another gang expert called by the People, opined that the shooting was gang-related because Cardiel had multiple Lincoln Heights tattoos, the shooting occurred in territory claimed by the Eastlake gang, and freshly painted graffiti was near the scene of the shooting.

## 2.    The Defense's Theory of the Case

At bottom, the defense theory was that Castillo was not the assailant, others who were potentially responsible for the killing were seen in front of the Marban residence prior to the shooting, Alberto's testimony was not credible, and the police's investigation, including the collection of forensic evidence, was sloppy. Defense counsel cited several examples of the police's

10

purportedly deficient investigative practices, including a detective's failure to change his gloves between handling each article of clothing found in the bathroom trash can. Additionally, trial counsel suggested that the GSR found on Castillo could have been transferred to him when he was handcuffed, and that his DNA could have been transferred to the rifle without him touching it.

Counsel also argued that although Alberto denied driving Castillo to Baldwin Park and then back to the Marban residence on the day of the shooting, Alberto admitted to a defense investigator that he had driven Castillo that day. Trial counsel further contended, among other things, that after Castillo returned to the Marban residence, he entered Alberto's bedroom and went to sleep.

## DISCUSSION

### A. Castillo's Claims of Prosecutorial Misconduct Do Not Warrant Reversal

"A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 242 (*Harrison I*).)

"A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citations.]" (*Harrison I, supra,* 35 Cal.4th at p. 242.) Although the cases

11

defining prosecutorial misconduct under state law employ "such adjectives as 'intemperate,' 'reprehensible,' 'egregious,' and 'deceptive,' the concept of 'prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.] No 'showing of bad faith is required to establish prosecutorial misconduct in argument to the jury.' [Citation.]" (See *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1362.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct [under state law] . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (See *Harrison I*, at p. 244.)

Castillo contends that the cumulative effect of the People's misconduct at trial violated his "federal and state constitutional rights to due process, requiring reversal." Specifically, Castillo identifies the following alleged instances of prosecutorial misconduct: (1) The People (a) "sandbagg[ed]" the defense during their rebuttal argument by contending that Castillo could have called his grandmother as a witness to support Castillo's theory that he was at the Marban residence prior to the shooting, and (b) failed to adhere to their obligations under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), by not disclosing that they had investigated Castillo's grandmother's whereabouts and determined there was no record indicating she was deceased or unavailable as a witness; (2) on the eve of trial, the People indicated for the first time that they intended to call Rosa Ramirez as a witness regarding statements Castillo made concerning the murder of his brother and the gang that

12

committed it;[7] (3) the People showed several photographs to the jury wherein Castillo was wearing jail wristbands; (4) the People disclosed to Castillo in the midst of trial that their fingerprint expert intended to testify that an item's exposure to hot and/or cold temperatures may prevent an analyst from recovering usable prints therefrom; and (5) the People played for the jury a recording of, and provided the jury with a transcript pertaining to, Castillo's interview with police, wherein Officer Alfaro stated that Castillo did not want to provide the police with a DNA sample.

We reject this claim of error because Castillo fails to demonstrate that the cumulative effect of these purported instances of prosecutorial misconduct warrants reversal.

First, Castillo has not shown that the People violated their *Brady* obligations by failing to disclose that they had conducted an investigation regarding the potential availability of his grandmother as a witness. "A *Brady* violation occurs if three conditions are met: ' "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is

---

[7] Although Castillo seems to challenge "[t]he prosecutor's failure to . . . timely disclose [Castillo's brother's] murder book," which allegedly included a note memorializing the contents of Ramirez's anticipated testimony, Castillo does not identify any other evidence in the book that the People were obligated to produce during discovery. Thus, we need not address the disclosure of the murder book itself further. (See *People v. Giordano* (2007) 42 Cal.4th 644, 666 (*Giordano*) ["On appeal, we presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be *affirmatively shown*[,]" ' " italics added].)

13

impeaching; [the] evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." [Citation.] Prejudice, in this context, focuses on "the materiality of the evidence to the issue of guilt or innocence." [Citations.]' [Citation.]" (*People v. Harrison* (2017) 16 Cal.App.5th 704, 709 (*Harrison II*).)

Castillo seems to argue that the People "knew that [Castillo's] grandmother was a *potentially* favorable witness to the defense, who *could* corroborate [Castillo's] presence [at the Marban residence]." (Italics added.) In response, the People correctly point out that their "investigation did not reveal the content of [Castillo's grandmother's] would-be testimony let alone that her testimony would exculpate [Castillo]." Instead, the record shows only that the People ascertained Castillo's grandmother's potential whereabouts and that public records suggest she is not deceased.

Nor did the People concede in their rebuttal argument that Castillo's grandmother would testify that she saw Castillo at the Marban residence prior to the shooting. The prosecutor asserted during the rebuttal argument: "*If* [Castillo] was there [(i.e., at the Marban residence prior to the shooting)], the grandmother would have known." (Italics added.) Hence, the prosecutor merely pointed out that Castillo's factual theory lacked evidentiary support that he could have easily supplied if his theory were true. It follows that Castillo has not demonstrated that the People violated *Brady* by withholding favorable (i.e., exculpatory or impeachment) evidence from him. (See *Harrison II*, *supra*, 16 Cal.App.5th at p. 709.)

Further, Castillo fails to establish that the People improperly sandbagged him by stating in their rebuttal argument

14

that Castillo's grandmother would have known whether Castillo was at the Marban residence prior to the shooting. Castillo's briefing suggests he believes this remark was improper because it was not " 'fairly responsive to argument of defense counsel' " and was "withh[eld] . . . until rebuttal . . . ." Yet, Castillo concedes—and the record reveals—that the People made this statement after defense counsel argued to the jury that Alberto took Castillo to the Marban residence, and that Castillo then went upstairs to the bedroom to go to sleep. Thus, it is not apparent that the People withheld this argument until their rebuttal, or that this remark was not fairly responsive to Castillo's closing argument. Given that Castillo does not further expound upon the basis of his allegation that the People sandbagged him, we reject his claim that this remark constitutes prosecutorial misconduct. (See *Giordano, supra,* 42 Cal.4th at p. 666 [" ' "[E]rror must be *affirmatively shown*[,]" ' " italics added].)

Moreover, the trial court granted continuances in an attempt to mitigate any prejudice resulting from the prosecution's belated disclosure of anticipated testimony from Rosa Ramirez and the People's fingerprint expert, respectively. After the defense informed the court that the prosecution had revealed the contents of Rosa Ramirez's prospective testimony shortly before trial was scheduled to commence, the court continued the trial from August 31, 2018 to January 23, 2019. With regard to the People's fingerprint expert, the trial court authorized Castillo's counsel to recall this expert for further cross-examination and, after the expert testified, the proceedings were continued for one day to afford the defense attorney an opportunity to consult with another fingerprint expert. Given these measures, it is not apparent that the People's alleged

15

misconduct relating to these two witnesses had any impact on Castillo's defense, nor has Castillo explained why the trial court's rulings failed to cure any purported prejudice.

Castillo's reliance on Officer Alfaro's recorded statement that Castillo did not want to provide a DNA sample and on the photographs showing Castillo's jail wristbands is also unavailing. We acknowledge that the prosecution had agreed to (but did not) ensure that the aforesaid evidence was not presented to the jury. Nonetheless, the trial court found that any prejudice resulting from Officer Alfaro's statement was "minimal" because this was a "brief" statement in a lengthy interview and Castillo ultimately provided a sample to the police. Similarly, the trial court found that photographs depicting Castillo's jail wristbands caused Castillo no "undue prejudice" because the photographs were shown for "no more than two seconds" without any comment and the jail wristbands were "not readily identifiable" by anyone, especially lay people. Castillo does not contest the trial court's characterizations regarding Officer Alfaro's statement or the photographs shown to the jury depicting Castillo's jail wristbands. We may thus consider them. (See *Giordano*, *supra*, 42 Cal.4th at p. 666.)

Instead, Castillo suggests that had the jury not known that he declined to provide a DNA sample during his interview with Officer Alfaro, then the jury would have rejected Alberto's testimony that he did not drive Castillo to the Marban residence on the day of the shooting. In particular, Castillo claims that the People elicited testimony from a detective that Alberto was willing to provide a DNA sample, and that Alberto testified he provided the sample " 'because [he] was not involved in anything.' " Any claim that excluding Officer Alfaro's statement

16

from Castillo's interview with police would have been fatal to Alberto's credibility is speculative, especially considering that the People later elicited testimony from Detective Miguel Barajas that Castillo "willing[ly] and cooperative[ly]" provided a DNA sample to him in connection with this case.

In sum, assuming arguendo that (with the exception of the People's remark concerning Castillo's grandmother and their efforts to ascertain her availability, which we find do not amount to misconduct), the People did perpetrate prosecutorial misconduct in the manner Castillo alleges, the cumulative effect of that purported malfeasance does not warrant reversal of the judgment. As noted above, Castillo has not shown that the trial court failed to cure any prejudice resulting from the late disclosure of Rosa Ramirez's and the fingerprint expert's anticipated testimony, or that the lower court erred in finding that Officer Alfaro's statement and the photographs of Castillo's jail wristbands had very little, if any, effect on the proceedings. Indeed, these instances of purported misconduct seemed to have no effect on the key evidentiary issues of this case, including the discovery of Castillo's DNA on the murder weapon, the GSR found on him, the suspicious circumstances surrounding Castillo's presence at the Marban residence, his membership in a gang that had a violent rivalry with Cardiel's gang, and Castillo's belief that his brother was killed by that rival gang. Thus, we find the alleged prosecutorial misconduct did not " 'infect[ ] the trial with such unfairness as to make the conviction a denial of due process[,]' " and " 'it is [not] reasonably probable that a result more favorable to [Castillo] would have been reached without the

17

misconduct.' "[8] (See *Harrison I*, *supra*, 35 Cal.4th at pp. 242, 244.)

## B. Castillo Fails to Establish the Trial Court Erred in Excluding Vanessa Bonet's Testimony

Castillo contends that the trial court erroneously excluded Vanessa Bonet's testimony under Evidence Code section 352, and, in so doing, "violated [Castillo's] federal and state constitutional rights to present a defense and due process." He maintains that on the day of the shooting, Bonet heard gunshots and observed that several people were near a black SUV, including a person who " 'might have been holding' " a handgun. Castillo insists that this evidence would have supported an imperfect self-defense theory because "Bonet's observation of a man who appeared to be holding a gun *near the overturned SUV* supported the defense theory that [Lincoln Heights] gang members were shooting in the direction of the house, and that Cardiel was fatally shot by return fire." (Italics added.) Castillo further contends that "[i]f the jury believed Bonet's testimony, it supported the alternative theory that a third-party shot Cardiel, *who came into the rival gang territory with other, armed gang members*, to carry out a 'mission' against [Eastlake]." (Italics added.) Hence, Castillo's challenge to the trial court's ruling is apparently predicated on his belief that Bonet would have

---

[8] Castillo also contends that the cumulative effect of the People's alleged misconduct and the other instances of trial error identified in his opening brief (e.g., the trial court's denial of his motion to bifurcate) warrants the reversal of the judgment. This claim fails because we reject Castillo's other claims of trial error as well. (See Discussion parts B–E, *post*.)

18

testified that she saw several persons *near* Cardiel's SUV, including an individual who may have been holding a handgun.

This theory is contradicted by the trial court's findings regarding Bonet's expected testimony. In the course of excluding Bonet from trial, the court stated: "With regard to Ms. Bonet's testimony, it appears to me that she was looking at a different location when she heard these shots. Some time passed before she even focused her attention on the vehicle where she saw these individuals, and one person in a crouched position who may have—may have or seemed to her to be holding a gun. [¶] My impression at this point is that that was a separate and different location from where it is alleged Mr. Castillo was when he supposedly fired the shots, and where the decedent was when the incident occurred."

The trial court further stated: "[W]here it's alleged the defendant shot these shots were at least three houses away—at least that's the way it appeared to me on the diagram,[9] from where the other location was where Ms. Bonet says that she said she saw another SUV. That, to me, appeared to be entirely unconnected, at least at this point, with this incident." The court then found that exclusion of Bonet's testimony was appropriate under Evidence Code section 352 on the ground that its introduction would result in an "[undue] consumption of time, create substantial danger of [undue] prejudice, confuse the issues and possibly mislead the jury." This ruling, and the findings

---

**9** Attached to the People's motion to exclude this evidence was a diagram drawn by Bonet on June 1, 2018, which appears to depict a black SUV, a curved roadway, and East Los Angeles Park.

19

supporting it, are presumed to be correct. (See *Giordano, supra*, 42 Cal.4th at p. 666.)

Castillo does not cite any evidence in the record to rebut these findings. Rather, he seems to rely upon defense counsel's representations concerning Bonet's anticipated testimony, including his trial attorney's assertion that "she saw the person with the gun 'perhaps within 25 feet' of where the vehicle was turned over." As a consequence, his challenge to the trial court's exclusion of Bonet's testimony fails. (See *People v. Flint* (2018) 22 Cal.App.5th 983, 1006, fn. 17 [" '[C]ourts will decline to consider any factual assertion unsupported by record citation at the point where it is asserted[.]' "]; *People v. Wallace* (2004) 33 Cal.4th 738, 754, fn. 3 [" '[I]t is axiomatic that the unsworn statements of counsel are not evidence.' "].)

In arriving at this conclusion, we observe that Castillo's appellate counsel submitted a letter to the trial court clerk requesting "Castillo's motion in limine filed on August 30, 2019, regarding testimony of Vanessa Bonet." The clerk responded by filing a certificate stating the following: "After a careful search of the superior court file, I was unable to locate the Defendant Castillo's Motion in Limine filed on August 30, 2019." It seems that Castillo's trial counsel actually filed the motion in question on August 30, *2018*. In any event, Castillo's appellate counsel does not clarify whether any evidence we could consider was attached to the motion in limine (e.g., statements from Bonet).

## C. Castillo's Claims of Instructional Error Fail

In his reply, Castillo readily admits his argument that "the trial court erred by failing to instruct the jury on the defenses of imperfect-self defense and third-party culpability . . . depend on the previous argument that Bonet's testimony [was] improperly

20

excluded." Because Castillo's appellate claim challenging the exclusion of Bonet's testimony fails, so too do his claims of instructional error.

## D. The Trial Court Did Not Err in Denying Castillo's Motion to Bifurcate the Criminal Street Gang Enhancement from the Trial of the Underlying Substantive Offenses

"Bifurcation of gang allegations is appropriate where the gang evidence is 'so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt.' [Citation.] In a case not involving imposition of the gang enhancement, such 'evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal.' [Citation.] On the other hand, 'evidence of gang membership is often relevant to, and admissible regarding, the charged offense.' [Citation.] Given the public policy preference for the efficiency of a unitary trial, a court's discretion to deny bifurcation of a gang allegation is broader than its discretion to admit gang evidence in a case with no gang allegation. [Citation.] Thus, '[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself . . . a court may still deny bifurcation.' [Citation.]" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 952 (*Franklin*).)

"We review the trial court's denial of the motion to bifurcate for abuse of discretion, based on the record as it stood at the time of the ruling. [Citations.] Our review is guided by the familiar principle that '[a] court abuses its discretion when its rulings fall "outside the bounds of reason" ' "—i.e., " ' "the trial court exercised its discretion in an arbitrary, capricious, or

21

patently absurd manner that resulted in a manifest miscarriage of justice[.]" ' " (See *Franklin, supra,* 248 Cal.App.4th at p. 952.) Further, "[i]f the trial court's ruling was correct on the record before it, the ruling is subject to reversal only upon a showing that ' "joinder actually resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.]" (*Id.* at pp. 952–953.)

Castillo argues the trial court erred in denying his motion to bifurcate the criminal gang enhancement from the trial of the underlying offenses because "[e]vidence that [Castillo's] brother was fatally shot five years earlier was too remote to support a motive of gang retaliation; . . . there was no evidence of a confrontation of rival gang members before the shooting to support the prosecution's theory that the perpetrator identified the victim as a rival gang member"; and "[t]he failure to bifurcate the gang enhancement created the impermissible risk that the jury would use evidence of [his] criminal propensity as a gang member to substitute for proof of the charged crimes." For the reasons discussed below, we conclude Castillo has not established that the trial court abused its discretion in denying his motion.

First, Castillo claims that "[t]he shooting of [Castillo's] brother was . . . too remote to supply a gang motive for the charged crimes" because "[i]t is patently unreasonable to conclude that a street gang would wait five years to pay back a rival gang for the killing of a gang member in order to 'get that respect back' for their gang," and "[i]t is equally unreasonable to conclude that a street gang would wait five years to prevent the appearance that a rival gang is stronger." Yet, Castillo concedes the People offered evidence that Lincoln Heights and Eastlake "were engaged in a violent rivalry" involving "*many* shootings." (Italics added.) Thus, the trial court did not act in " ' "an

arbitrary, capricious, or patently absurd manner" ' " in impliedly finding there was evidence that Eastlake gang members had engaged in violent skirmishes with Lincoln Heights on other occasions prior to the shooting and did not "wait" five years to retaliate against Lincoln Heights for the murder of Castillo's brother.  (See *Franklin*, *supra*, 248 Cal.App.4th at p. 952.)  Further, the lower court acted within " ' "the bounds of reason" ' " in concluding that even after five years, Castillo would still want revenge for the murder of a person who was his sibling and a fellow Eastlake gang member.  (See *ibid.*)

Next, Castillo argues that "[t]he prosecutor's assertion that the shooting resulted from a 'confrontation' between rival gang members was . . . without any evidentiary support" because "Cardiel . . . was driving alone[ ] in his . . . vehicle[ and] was shot at long range with a high-powered rifle."  Nevertheless, Castillo concedes that the "[p]olice found the rifle used in the shooting in the back yard" and that "DNA on the rifle matched [Castillo's] DNA profile."  It is also undisputed the People offered evidence that:  Shortly after the shooting, the police found Castillo breathing heavily and sweating in a bedroom inside the Marban residence, and the police found casings fired from the rifle just outside that building.  In addition, the People introduced evidence that Castillo was an Eastlake gang member, Cardiel was a Lincoln Heights gang member who had tattoos indicating he was a member of that gang, the shooting occurred in territory claimed by the Eastlake gang, and across the street from the Marban residence was recently spray-painted graffiti that included Castillo's gang moniker (Swifty) and the name of Castillo's gang.  Thus, the trial court acted within the bounds of reason in implicitly ruling that the People proffered

23

circumstantial evidence that the shooting was a confrontation between two rival gang members.

Lastly, Castillo's assertion that the denial of his motion "created the impermissible risk that the jury would use evidence of [his] criminal propensity as a gang member to substitute for proof of the charged crimes" appears to be predicated on his claim that there was no "connection between [his] gang affiliation and the charged crime . . . ." That premise fails because, as noted above, the People offered evidence suggesting that Castillo's gang membership supplied a motive for the shooting. (See *Franklin, supra*, 248 Cal.App.4th at pp. 952–953 ["Bifurcation of gang allegations is appropriate where the gang evidence is 'so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt.' [Citation.] . . . [¶] [G]ang evidence is 'relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related.' [Citation.] ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' [Citation.]"].)

In conclusion, we find the trial court did not err in denying Castillo's motion to bifurcate the gang enhancements from the trial of the underlying charges.

### E. The People Presented Substantial Evidence that Castillo Perpetrated the Shooting for the Benefit of a Criminal Street Gang

" 'In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the

judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 656–657 (*Ochoa*).)  In conducting this analysis, the reviewing court must "view[ ] all the evidence in the light most favorable to the prosecution, and draw[ ] all reasonable inferences in favor of the jury's findings."  (See *People v. Perez* (2017) 18 Cal.App.5th 598, 607 (*Perez*).)

"[W]e *must* begin with the presumption that the evidence . . . *was* sufficient, and the defendant bears the burden of convincing us otherwise. . . . [¶] . . . [A]n appellate court is 'not required to search the record to ascertain whether it contains evidence that will sustain [the appellant's] contentions.' [Citation.] . . . [¶] . . . [T]he defendant must set forth in his opening brief *all* of the material evidence . . . in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict."  (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573–1574 (*Sanghera*).)

This substantial evidence standard applies to sufficiency-of-the-evidence challenges to enhancements imposed pursuant to section 186.22, subdivision (b).  (See *Ochoa*, *supra*, 179 Cal.App.4th at pp. 656–657.)  Section 186.22, subdivision (b) authorizes the trial court to enhance a defendant's prison sentence if he or she committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (See § 186.22, subds. (b)(1) & (b)(4).)

Castillo alleges the People did not offer sufficient evidence that he perpetrated the shooting for the benefit of a criminal street gang. In support of this claim of error, Castillo seems to argue that Detective Cobian's and Officer Alfaro's testimony[10] that the shooting was gang-related was speculative because there was no evidence "that a confrontation between rival gang members precipitated the shooting." For the same reasons we found that the trial court did not act arbitrarily, capriciously, or in a patently absurd manner in impliedly finding there was circumstantial evidence that the shooting was a confrontation between two rival gang members, a rational trier of fact could have also drawn that inference as well. (See Discussion part D, *ante*; *Perez*, *supra*, 18 Cal.App.5th at p. 607 [holding that, in reviewing a sufficiency-of-the-evidence challenge, an appellate court must "view[ ] all the evidence in the light most favorable to the prosecution, and draw[ ] all reasonable inferences in favor of the jury's findings"].)

Further, Officer Cobian testified that an Eastlake gang member would be expected to defend territory claimed by his gang from a rival gang member who entered his gang's territory. Given the evidence identified in Discussion part D, *ante*, that Castillo (an Eastlake gang member) confronted Cardiel (a Lincoln Heights gang member) in Eastlake gang territory, the jury could reasonably have relied upon Officer Cobian's testimony to

---

**10** Although Castillo actually contends that Detective Cobian's and *Detective Ramirez's* expert opinions were deficient, the Attorney General correctly points out that Castillo actually intended to refer to Detective Cobian's and *Officer Alfaro's* trial testimony.

26

conclude that Castillo committed the instant offenses to defend territory claimed by his gang.

Castillo also challenges Officer Alfaro's testimony that the presence of freshly painted Eastlake gang graffiti near the shooting indicated that the killing was gang-related. Castillo insists that under that logic, "any crime committed in gang territory that had been sprayed with graffiti would be transformed into a gang-related offense." Castillo ignores the evidence that the freshly-sprayed graffiti bore his gang moniker, which suggests that *he* recently spray painted it. He also overlooks Officer Cobian's testimony that the presence of this graffiti indicated that an Eastlake gang member had spray painted the wall to claim his gang's territory. Under these circumstances, a rational factfinder could have considered the graffiti to be evidence further indicating that Castillo shot Cardiel for the purposes of defending Eastlake gang territory from one of its rivals.

In sum, Castillo has not shown the jury's finding that he perpetrated the crimes in question to benefit his gang is unsupported by substantial evidence. Accordingly, Castillo's insufficiency-of-the-evidence challenge to the gang enhancements fails. (See *Sanghera, supra*, 139 Cal.App.4th at p. 1573 ["[W]e *must* begin with the presumption that the evidence . . . *was* sufficient, and the defendant bears the burden of convincing us otherwise. . . ."].)

## F.     Although the Trial Court Did Not Err in Imposing the 15-Year Minimum Parole Eligibility Date, the 10-Year Gang Enhancements Should Be Stricken

As we noted earlier, the trial court imposed the following sentence for Castillo's conviction for first degree murder:

27

25 years to life, with a consecutive sentence of 25 years to life imposed on that count pursuant to section 12022.53, subdivision (d); and a 10-year concurrent enhancement on count 1 under section 186.22, subdivision (b)(1)(C) that was stayed pursuant to section 654. With regard to Castillo's aggregate prison term, the trial court ruled that, pursuant to section 186.22, subdivision (b)(5), Castillo could not be paroled until he had served a minimum of 15 years of his prison sentence. Additionally, in respect to count 2, the trial court imposed, but stayed, a 10-year enhancement pursuant to section 186.22, subdivision (b)(1)(C).

Castillo claims that the trial court's imposition of the 15-year minimum parole eligibility date was an unauthorized sentence that must be stricken because he had been sentenced to an indeterminate term of 25 years to life. Furthermore, the parties agree that we should strike the 10-year gang enhancements on counts 1 and 2, respectively. Although we accept the parties' concession regarding the 10-year enhancements, (see *Artal*, *supra*, 111 Cal.App.4th at p. 275, fn. 2), we reject Castillo's request to strike the 15-year minimum parole eligibility date for the reasons discussed below.

Section 186.22, subdivision (b)(1)(C) states in pertinent part: "Except as provided in paragraph[ ] . . . (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: . . . [¶] . . . [¶] If the felony is a violent

28

felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years." (See § 186.22, subd. (b)(1)(C).)

As relevant here, subdivision (b)(5) in turn provides: "[A]ny person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." (See § 186.22, subd. (b)(5).)

Although Castillo's argument on this point is not altogether clear, he apparently relies on *People v. Herrera* (2001) 88 Cal.App.4th 1353, for the proposition that, "[w]hen a defendant is sentenced to 25-years-to-life for first degree murder, the minimum fifteen-year parole eligibility of section 186.22, subdivision (b)(5), does not apply."[11] In *Herrera*, a jury convicted a defendant of first degree murder, and found true a firearm allegation under section 12022.53, subdivision (d) and a gang enhancement allegation under section 186.22, subdivision (b)(1). (*Herrera*, at pp. 1356–1357.) The trial court imposed a prison term of 25 years to life, along with a consecutive term of 25 years to life for the firearm enhancement, and an additional term of 3 years for the gang enhancement. (See *id.* at p. 1357.)

---

[11] Although Castillo cites *People v. Harper* (2003) 109 Cal.App.4th 520, for this proposition as well, *Harper* actually arrived at the opposite conclusion. (See *Harper*, at pp. 522, 527 ["Because [the defendant] was sentenced to a life term [for first degree murder], section 186.22 mandates that the alternate punishment of a 15-year minimum parole eligibility be imposed. In this case, the 15-year minimum parole eligibility has little effect since it is subsumed in the 25-year minimum parole eligibility imposed for the underlying murder conviction. [Citation.]"].)

On appeal, the *Herrera* court rejected the defendant's argument that the 3-year gang enhancement had to be stricken and replaced with a minimum period of imprisonment prior to parole of 15 years. (*Herrera, supra*, 88 Cal.App.4th at p. 1357.) The Court of Appeal reasoned that section 186.22, subdivision (b)(4) (which has since been moved to subd. (b)(5)) was inapplicable because certain amendments to section 190 barred a defendant convicted of murder from being paroled before serving 25 years in prison. (See *Herrera*, at pp. 1357–1365 & fns. 2–3.) As a consequence, *Herrera* affirmed the 3-year enhancement and held that the 15-year minimum parole eligibility date was inapplicable. (See *id.* at pp. 1363–1364.)

Our high court later rejected *Herrera*'s assumption that section 190 renders section 186.22, subdivision (b)(5) inapplicable to defendants convicted of first degree murder. In *People v. Lopez* (2005) 34 Cal.4th 1002, the high court concluded there is no inconsistency between these two provisions. *Lopez* explained that "the . . . penalty set forth in section 190—i.e., 25 years to life—is [a] proper punishment for [a] defendant's first degree murder conviction," and "[t]he true finding under section 186.22(b)(5), which provides for a lower minimum term, 'is a factor that may be considered by the Board of Prison Terms when determining a defendant's release date, even if it does not extend the minimum parole date per se.' [Citation.]" (See *Lopez*, at p. 1009.) "Thus, the fact that section 190 fixes a parole eligibility date equal to or greater than that provided by section 186.22(b)(5) is neither an absurdity nor an anomaly . . . ." (See *Lopez*, at p. 1009.)

Because *Lopez* impliedly disapproved of *Herrera*'s interpretation of the predecessor to section 186.22,

subdivision (b)(5), it would be improper for us to strike Castillo's 15-year minimum parole eligibility date.  (See *Tanguilig v. Bloomingdale's, Inc.* (2016) 5 Cal.App.5th 665, 673 ["[A]s an inferior state court, we are bound to follow the California Supreme Court's holding . . . under the doctrine of stare decisis."].)

# DISPOSITION

The judgment is modified as follows: (1) We strike the 10-year gang enhancement imposed on count 1 under Penal Code section 186.22, subdivision (b)(1)(C); and (2) we strike the 10-year gang enhancement imposed on count 2 under Penal Code section 186.22, subdivision (b)(1)(C). As modified, the judgment is affirmed.

Upon the issuance of our remittitur, the trial court is directed to prepare a corrected minute order consistent with the views expressed in this opinion, amend the abstract of judgment, and send certified copies of the amended abstract of judgment to the Department of Corrections and Rehabilitation. The clerk of the court is directed to send a copy of the opinion and remittitur to the Department of Corrections and Rehabilitation. (See Cal. Rules of Court, rule 8.272(d)(2).)

NOT TO BE PUBLISHED.


BENDIX, J.

We concur:


ROTHSCHILD, P. J.          FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32